UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL ROBERTS AND | : | NO.: 3:13CV00435 (SRU) |
| ANNETTE ROBERTS | : | |
| | : | |
| v. | | |
| | : | |
| LIBERTY MUTUAL FIRE INSURANCE | : | |
| COMPANY | : | JUNE 16, 2016 |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**</u>

The defendant, Liberty Mutual Fire Insurance Company ("Liberty"), hereby submits this memorandum of law in support of its motion for summary judgment.

**I.** <u>**BACKGROUND AND FACTS**</u>:

This is an action for breach of an insurance contract, bad faith, and unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA").    The facts giving rise to this action are as follows: Liberty issued a homeowners policy, Policy Number H32-218-161402-40 (hereinafter the "Policy"), to the plaintiffs, Annette and Michael Roberts. **Ex. A**.  The Policy had effective dates of October 9, 2012 through October 9, 2013, and provided dwelling coverage limits of $298,500.

The plaintiffs initiated this action by way of summons and complaint filed April 17, 2013.   In the complaint, the plaintiffs allege that they purchased the subject

ORAL ARGUMENT IS REQUESTED

property in 1990 and that its construction had been completed that same year. **Ex. C,** **¶ 4.** They claim that they noticed a series of horizontal and vertical cracks throughout most of the basement walls of their home in June or July of 2012. **Ex. C, ¶ 8.**

The plaintiffs allege that they insured their property at all times since 1990 with a homeowners policy issued by Liberty. **Ex. C, ¶ 5.** However, the plaintiffs did not insure their property with Liberty until October 9, 2007.[1] They alleged that the cause of the "pattern cracking" was due to a chemical compound found in concrete most likely provided by the J.J. Mottes Concrete Company. **Ex. C, ¶ 10.** The plaintiffs allege that the aggregate used in the concrete contained a chemical compound which has begun to oxidize and expand.[2] **Ex. C, ¶ 11.** They claim that the oxidation process cannot be arrested, that it continues to advance with or without the presence of visible water, and that it is only a matter of time before the basement walls will fall in due to the exterior pressure from the surrounding soil, resulting in the building falling into the basement. **Ex. C, ¶ 12 and 14-15.** The plaintiffs have pled that a substantial impairment to the structural integrity of their basement walls occurred "at some point" between 1990 and July of 2012. **Ex. C, ¶13.**

---

[1] This court can take judicial notice that the plaintiffs brought suit against their prior homeowner insurer from August of 2000 through October of 2007, Amica Mutual Insurance Company, for the same loss in Civil Action No. 3:13-cv-00435 (SRU). **Ex. B**. Liberty believes the plaintiffs will stipulate to this clarification.

[2] Liberty's petrographic analysis has confirmed that  the iron sulfide oxidation process commonly attributed to substandard Mottes concrete has occurred in the plaintiffs' basement walls. **Ex. L**, p. 7.

The plaintiffs reported their claim on December 14, 2012 **Ex. E**, p. 2.  Liberty dispatched a structural engineer, Michael Berry, to analyze their basement walls on January 3, 2013 and he authored a January 4, 2013 report detailing his findings.  **Ex. C**, ¶18-19 and **Ex. G**, p. 1.  Liberty relied on its retained engineer's findings in denying coverage via correspondence dated January 10, 2013.  **Ex. C,** ¶20 and **Ex. G**, p. 1.

The plaintiffs allege that Liberty has breached its contract by not providing coverage under the Policy for the alleged loss.  The extra-contractual allegations claim that Liberty has a general business practice of denying  what their attorneys refer to as "concrete decay" claims as part of its participation in an insurance industry-wide conspiracy and that Liberty intentionally and in bad faith denied the claim based upon clearly inapplicable policy provisions.

The Policy, as modified by its various endorsements, states in relevant part:

---

**SECTION I—PERILS INSURED AGAINST**

**COVERAGE      A—DWELLING    and     COVERAGE      B—OTHER
STRUCTURES**

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property.  We do not insure, however, for loss:

**1.**      Involving collapse, other than as provided in Additional Coverage **8.**;

**2.**      Caused by:

**. . . .**

    **b.**    Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

        **. . . .**

        **(2)**    Foundation, retaining wall, or bulkhead; or

        **. . . .**

        **(4)**    Footing(s)

        **. . . .**

    **e.**    Any of the following:

        **(1)**    Wear and tear, marring, deterioration;

        **(2)**    Inherent vice, latent defect, mechanical breakdown;

        **(3)**    Smog, rust or other corrosion;

            **. . . .**

        **(6)**    Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

**. . . .**

**ADDITIONAL COVERAGES**

**. . . .**

**8**.    **Collapse.**  We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a.   Perils Insured Against in COVERAGE C—PERSONAL PROPERTY.  These perils apply to covered buildings and personal property for loss insured by this additional coverage:

b.   Hidden decay;

c.   Hidden insect or vermin damage;

d.   Weight of contents, equipment, animals or people;

e.   Weight of rain which collects on a roof; or

f.   Use of defective material or methods in construction, remodeling or renovation;

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

.  .  .  .

---

## SECTION I—EXCLUSIONS

**1.**   We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

.  .  .  .

5

      b.    **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting;  **. . .**

      c.    **Water Damage,** meaning:

          (1)    Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

          (2)    Water which backs up through sewers or drains or which overflows from a sump;

          (3)    Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

**. . . .**

      e.    **Neglect,** meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

**. . . .**

**2.**    We do not insure for loss to property described in Coverages A and B caused by any of the following.  However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

**. . . .**

      c.    **Faulty, inadequate or defective:**

          (1)    Planning, zoning, development, surveying, siting;

      (2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3)    Materials used in repair, construction, renovation or remodeling; or

      (4)    Maintenance;

of part or all of any property whether on or off the "residence premises."

. . . .

---

## SECTION I—CONDITIONS

---

. . . .

**2.**    **Your Duties After Loss.**  In case of a loss to covered property, you must see that the following are done:

      **a.**    Give prompt notice to us or our agent;

      . . . .

      **d.**    Protect the property from further damage.  If repairs to the property are required, you must:

            **(1)**    Make reasonable and necessary repairs to protect the property; and

            **(2)**    Keep an accurate record of repair expenses;

. . . .

8.   **Suit Against Us.**   No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.[3]

. . . .

---
### SECTIONS I AND II—CONDITIONS
---

1.   **Policy Period.**   This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

(**Ex. A**).

. . . .

Liberty moves for summary judgment as to all counts on the grounds that the Policy does not provide coverage for the plaintiffs' claim, it evaluated and denied the plaintiffs' claim on its own merits, and the plaintiffs' allegations of a general business practice of denying "concrete decay" claims and its participation in an insurance industry-wide conspiracy regarding its denial of their claim have no factual basis.

II.   <u>**LAW AND ARGUMENT**</u>:

A.   <u>**Standard Of Review**</u>:

The court shall render summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[3]  The Policy was issued after the July 1, 2012 effective date of Public Act No. 12-162, which statutorily extended the suit limitations period for claims under Connecticut homeowners policies from twelve to eighteen months (Conn. Gen. Stat. § 38a-308 (b)).

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-48. A "material fact" is one whose resolution would affect the ultimate determination in the case. *Id.* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims… and it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).

A non-moving party may not rely on mere allegations, legal conclusions, unsupported statements, or a denial of the pleadings. *See Celotex Corp.*, 477 U.S. at 327. "[A] plaintiff must do more than whet the curiosity of the court; he must support vague accusation and surmise with concrete particulars." *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 96 (2nd Cir. 1970). The opposing party is entitled to the benefit of all favorable inferences which can be drawn from the underlying facts; however, only *reasonable* inferences will be drawn, not every conceivable inference. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987). "[T]he inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind…." *NLRB v. Martin A Gleason, Inc.*, 534 F.2d 466, 474 (2nd Cir. 1976).

**B.**     <u>There Is No Coverage For The Plaintiffs' Claim:</u>

**1.**     **The undefined policy terms "foundation" and "retaining walls" are unambiguous:**

The plaintiffs' claim is clearly barred by the Policy provision which excludes coverage for loss caused by faulty, inadequate or defective materials used in construction.   Moreover, their claim is unquestionably barred by the Policy provisions which excludes losses caused by water damage and disclaims losses caused by settling, shrinking, bulging or expansion, including resultant cracking.   As such, the plaintiffs have put forth a clever argument in which they seek coverage for their claim pursuant to the "collapse" provision of the Policy.   However, the "collapse" provision excludes coverage for loss to a foundation or retaining wall unless the loss is a direct result of the collapse of the building.   The terms "foundation" and "retaining wall" are not defined in the Policy, but merely because a term is undefined does not render it ambiguous.

Liberty appreciates this Honorable Court's prior rulings in matters with identical allegations wherein this Court held that the undefined policy terms "foundation" and "retaining wall" were ambiguous.   *See, Bacewicz v. NGM Ins. Co.*, 2010 WL 3023882 (D.Conn. 2010); *Karas v. Liberty Ins. Corp.*, 33 F.Supp. 3d 110 (D.Conn. 2014); *Belz v. Peerless Ins. Co.*, 46 F.Supp. 3d 157 (D.Conn. 2014).   However, it respectfully disagrees with this Court's prior determinations.   Moreover, this Court has recently

inferred that its prior resolution of a purported contractual ambiguity in a matter with identical allegations may have been wrongly decided.  *See, Roberge v. Amica Mutual Ins. Co.*, 2015 WL 9480008, p. 2-3 (D.Conn. 2015).

"To determine the common, natural, and ordinary meaning of an undefined term, it is proper to turn to the definition found in a dictionary."  *New London County. Mutual Ins. Co. v. Zachem*, 145 Conn. App. 160 (2013).  The dictionary definition of foundation is:  "a usually stone or concrete structure that supports a building from underneath; . . . an underlying base or support; *especially*: the whole masonry substructure of a building."[4]

In *Karas* and *Belz*, this Court held that the terms "foundation" and "retaining wall" were ambiguous and declined to certify the determination of this debate to the Supreme Court of Connecticut.  In ruling that "foundation" is ambiguous, this Court relied upon its *Bacewicz* decision.  However, no Connecticut appellate court has addressed this issue.  Only one appellate court has had an opportunity to consider this language in a similar matter; interestingly enough, it was the plaintiffs' attorney's suit to recover for the "collapse" of his wife's basement walls.  *Parker v. Worcester Ins. Co.*, 247 F.3d 1 (1st. Cir. 2001). The policy contained a substantially identical collapse provision. The argument that "foundation" and "retaining wall" were ambiguous was not made through the time of appeal, despite eleven references in the opinion to the

---

[4] http://www.merriam-webster.com/dictionary/foundation.

basement walls as either the "foundation" or "foundation walls."  The First Circuit noted in *Parker* that "[u]nless there is a rabbit hidden somewhere in the hat, it is not apparent to us how Kathy Parker can establish coverage."  *Parker*, 247 F.3d at 6.  The Court noted that while "lawyers are inventive in finding ambiguities to construe against the insurer. …we think it is fair to point out the apparent difficulties..."[5]  *Id.* Thus, the First Circuit did not consider "foundation" or "retaining wall" to be ambiguous. However, it accurately forecasted what lie ahead in the interpretation of the subject "collapse" provision—lawyers inventing ambiguities where none actually exist.

The sole authority cited in *Bacewicz* for this supposed ambiguity in the undefined term "foundation" was the Supreme Court of Alabama's decision in *Turner v. State Farm Fire and Casualty Cos.*, 614 So.2d 1029 (Ala. 1993). However, *Turner* did not quote a dictionary definition that suggested that the term "foundation" does not include the poured concrete basement walls.

Moreover, the facts in *Turner* are distinguishable.  In *Turner*, the homeowners claimed that the term "foundation" would not encompass their basement walls because the walls were free standing when constructed and initially formed the interior walls of the first floor of the dwelling.  Mr. Turner claimed that he subsequently filled dirt around the walls to make a basement sometime after construction. *Turner*, 614 So.2d at 1031.

---

[5] In detailing the apparent futility of a contractual ambiguity argument, the First Circuit noted that its opinion was without prejudice to resolution after full briefing.

Conversely, the plaintiffs' basement walls were formed during the property's construction in 1990.   This Court's ruling did not indicate that these differences were considered.

The Turners contended that they understood the term "foundation" to refer to the three-by-three foot piece of concrete under the basement walls (its footings). *Turner*, 614 So. 2d at 1031.  It is unclear from *Turner* whether the policy in that matter contained the amendatory endorsement which exists in the instant matter and referenced, *supra*, which clearly sets apart the terms "footings" and "foundation." Interpretation of an insurance policy must be based on the language expressed in the entire policy.  *Wentland v. American Equity Ins. Co.*, 267 Conn. 592 (2004).  "When interpreting an insurance policy, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result (internal quotations omitted)."  *Connecticut Medical Ins. Co. v. Kulikowski*, 286 Conn. 1, 6 (2008).

From the clear language of the Policy, as amended by endorsement FMHO 2855 12 11, both parties to this litigation contractually agreed to this distinction (**Ex. A**, p. 27).   The plaintiffs cannot credibly argue that the Policy term "footings" is ambiguous.   If this court rules that the footings do not constitute any part of the dwelling's foundation, then the basement walls must comprise its foundation.  A ruling that the footings are the entire foundation would render the distinction found in the

Policy between footings and foundation entirely superfluous and needlessly redundant. Respectfully, such a ruling would directly conflict with binding precedent from the Supreme Court of Connecticut concerning proper contractual interpretation.

Liberty disagrees with the Supreme Court of Alabama's interpretation and believes that the Supreme Court of Connecticut would conclude otherwise. The Supreme Court of Connecticut in *Beach v. Middlesex Mut. Ass. Co.*, 205 Conn. 246 (1987)—the seminal case in this state interpreting the undefined policy term "collapse"—repeatedly referred to the basement walls as "foundation walls" and the "foundation."[6]  Thus, Liberty believes that the Supreme Court of Connecticut will make a similar finding as that made in *Wurst v. State Farm Fire and Casualty Company*, 431 F.Supp.2d 501 (D. N.J. 2006); namely, that the undefined policy term "foundation" includes the concrete basement walls.

A Massachusetts Superior Court found no ambiguity in the undefined policy terms "foundation" and "retaining walls" in *Shoemaker v. Liberty Mut. Ins. Co.*, 17 Mass.L.Rptr. 57 (Mass. Super. Ct. 2003), wherein the plaintiffs sought recovery for the collapse of the foundation wall at the right rear underneath the attached garage.  The court ruled for the insurer, citing the exclusions under the "Collapse" provision for "loss to a…foundation, retaining wall…"  The Shoemakers did not argue that "foundation" or

---

[6] The earliest Connecticut matter concerning allegedly defective Mottes concrete also repeatedly refers to the basement walls as the foundation.  *See Tofolowsky v. Bilow*, 2003 WL 1475141 (Conn. Super. 2003).

"retaining wall" was ambiguous and the opinion made clear that any such argument would have proven unsuccessful:

> "…loss to a foundation is within a list of ancillary items to a home under the plain terms of the provision. The ancillary terms are not part of the building. As such, reading the provision to allow for insurance coverage when the collapse of the Shoemakers' 'foundation' was not caused by the collapse of the garage itself, would render the exclusionary phrase, '…unless the loss is a direct result of the collapse of a building,' meaningless." *Id.*

Moreover, in *Beach*, the Connecticut Supreme Court repeatedly referred to basement walls as retaining walls when construing homeowners policy terms. *Beach*, 205 Conn. at 249. *See also*, *Nix v. State Farm Fire & Cas. Co.*, 444 Fed.Appx. 388 (11th Cir. 2011) (collapse of retaining wall in basement of insureds' home excluded from coverage). Thus, even if the concrete basement walls that support the plaintiffs' home are not part of the "foundation" (which is expressly denied), they are retaining walls that prevent earth from entering the basement. Merriam-Webster defines retaining wall as "a wall built to resist lateral pressure other than wind pressure; *esp*: one to prevent an earth slide".[7] The Oxford American English Dictionary defines retaining wall as "a wall that holds back earth or water."[8] The Free Dictionary by Farlex defines retaining wall as "A wall built to hold back a mass of earth or water."[9]

---

[7] http://www.merriam-webster.com/dictionary/retaining%20wall.
[8] http://www.oxforddictionaries.com/us/definition/american_english/retaining-wall?q=retaining+wall.
[9] http://www.thefreedictionary.com/retaining+wall.

15

The purpose of a retaining wall is to hold back earth.  Whether the wall is free-standing or attached to a structure, if it serves that function, it is a retaining wall. Liberty contends that the undefined terms "foundation" and "retaining wall" are unambiguous and clearly encompass the basement walls.

**2.  Extrinisic evidence reveals that the claimed loss is to the foundation:**

 In the event that this Court rules that the undefined Policy terms "foundation" and "retaining wall" are ambiguous, the analysis does not conclude there. The standard for the ultimate resolution of a purported ambiguity in an insurance contract was set forth by the Connecticut Supreme Court in *Metro Life Ins. Co. v. Aetna Cas. and Sur. Co.*, 255 Conn. 295, 306 (2001): "If the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation…If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact ....[internal citations omitted]."[10]

---

[10] This Court recognized this standard in *Bacewicz.*, 2010 WL 3023882 at 3 ("Where contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered, and the determination of the parties' intent is a question of fact [internal citations omitted]").

The Chief Justice of the Supreme Court of Connecticut, Chase T. Rogers, authored a concurring opinion joined by Justice Peter T. Zarella which reinforced the *Metro Life* holding :

> "…in the event that an insurance policy term is deemed to be ambiguous, the parties are entitled to present extrinsic evidence regarding the mutual intent of the insured and the insurer as to the scope of coverage, and the trial court must consider that evidence before applying the rule of contra proferentem to resolve the ambiguity in favor of the insured.  In other words, the rule should be applied as a tie breaker only when all other avenues to determining the parties' intent have been exhausted."

*Connecticut Ins. Guar. Ass'n. v. Drown*, 314 Conn. 161, 195 (2014).

The *Drown* dissent, authored by Justice McDonald and joined by Justice Eveleigh, also noted the same principle that "because the parties both have advanced reasonable constructions, I believe we properly may consider undisputed extrinsic evidence." *Drown*, 314 Conn. at 209.  That is four of the seven current justices of the Supreme Court of Connecticut reiterating long-standing Connecticut law.  *See also, Connecticut Ins. Guar. Ass'n. v. Fontaine*, 278 Conn. 779, 788 (2006) ("Thus, having concluded that the relevant policy language is ambiguous, we ordinarily would be free to consider extrinsic evidence, although if the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact…The present case is, however, before both the trial court and this court on a statement of stipulated facts, and, accordingly, the language

falls into the category of ambiguities 'that cannot be resolved by examining the parties' intentions.").

While Liberty disagrees with this Court's ruling that the terms "foundation" and "retaining walls" are ambiguous and maintains that there is sufficient reason to believe the Supreme Court of Connecticut would hold differently, it respects this Court's determination.  However, ultimately the trier of fact—which will be the jury should this matter proceed to trial—will determine whether it can resolve the supposed ambiguities and reach the mutual intent of the parties as to these terms upon consideration of the extrinsic evidence if the extrinsic evidence presents issues of credibility or choices among reasonable inferences.  Only if it cannot will any ambiguities be construed against the defendant.

The extrinsic evidence presents no issues of credibility or choice among reasonable inferences.  No reasonable jury could resolve the purported ambiguities in the plaintiffs' favor.  Mr. Roberts testified as follows at his deposition:

> Q.  *Sure.  What is your understanding of the term "foundation" in*
> *relation to your property?*
> A.  *The term foundation?*
> Q.  *Right.*
> A.  *Holds up the house.*
> Q.  *Okay.  And do you consider your basement walls*
> *part of your foundation?*
> A.  *Yeah.*

**Ex. K**, p. 57.

Thus, Mr. Roberts considers his basement walls to be part of his foundation. Moreover, the plaintiffs' expert structural engineer, David Grandpre, has testified that the terms "foundation walls", "foundation", and "basement walls" are used interchangeably. **Ex. I**, p. 71. He has testified that "basement walls" are defined as part of the foundation in the currently-adopted Connecticut residential building code and are considered as such in the engineering industry **Ex. N,** p. 2-3; **Ex. M**, p. 70-71. The plaintiffs' expert building contractor, Mr. Soucy, also uses the term "foundation" interchangeably with the term "basement walls." **Ex. J**, pp. 18, 23, 35, 39. The multi-part NBC Connecticut investigative series which commenced in July of 2015 regarding allegedly defective Mottes concrete refers to these "concrete decay" claims as concerning "crumbling foundations."[11]  As such, Liberty submits that all of the extrinsic evidence leads to the conclusion that the claimed condition is to the foundation.

The plaintiffs have put forth a clever argument to avoid the exclusion of coverage for the cracking to their foundation. However, clever legal arguments do not override the unambiguous Policy language. The terms "foundation" and "retaining wall" are not ambiguous. However, even if they were, the extrinsic evidence reveals that these terms—and particularly "foundation"—were understood by both parties to refer to the property's basement walls. No reasonable jury could conclude otherwise.

---

[11] http://www.nbcconnecticut.com/troubleshooters/TroubleshootersInvestigationCrumbling-Foundations-Home-Basement-Concrete-318061181.html.

3.      **Any claimed substantial impairment to the structural integrity of the basement walls did not occur during a Liberty policy period:**

The law in the state of Connecticut is that the undefined policy term "collapse" is sufficiently ambiguous to include coverage for any substantial impairment to the structural integrity of a building.[12]  *Beach*, 205 Conn. at 252.  Mr. Grandpre prepared an affidavit concerning his understanding of the iron sulfide oxidation process in a lawsuit with identical allegations.  **Ex. P**.  Mr. Grandpre has testified that basement walls afflicted with defective concrete wherein the iron sulfide oxidation process was unfolding would suffer a substantial impairment to their structural integrity between ten-to-fourteen years after pour.  **Ex. M**, p. 100-103.  His opinion fits the timeline for when a homeowner whose foundation was afflicted with this alleged Mottes concrete problem would notice a "tremendous amount of cracks and discoloration in the foundation."  *Tofolowsky*, 2003 WL 1475141 at 1 (foundation constructed in 1984, cracking noticed in 1993, tremendous amount of significant cracking noticed in 1995).

It is undisputed that the basement walls at the plaintiffs' property are comprised of concrete wherein iron sulfide minerals have oxidized and that such oxidation has resulted in cracks.  It is also undisputed that these walls were poured in 1990.  Thus, according to the plaintiffs' engineering expert the substantial impairment to structural integrity occurred sometime between 2000 and 2004.  Liberty did not insure the

---

[12] Liberty maintains that basement walls are not part of the building.

property until October 9, 2007.  Thus, according to Mr. Grandpre's testimony, any substantial impairment to the structural integrity of the basement walls occurred prior to Liberty insuring the risk.  The "Policy Period" condition in the Policy bars this claim against Liberty.

### C.  No reasonable jury could conclude that Liberty acted in bad faith:

The Supreme Court of Connecticut has held that absent a wrongful denial of a benefit under the Policy, there can be no action for bad faith.  *Capstone Building Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 794-98, 67 A.3d 961 (2013).  Thus, Liberty is entitled to summary judgment on Count II if this Court rules in Liberty's favor as to the plaintiffs' breach of contract count.

The standard for bad faith is well-established:  "Bad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties. . . .   [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  *Buckman v. People Express, Inc.*, 205 Conn. 166, 171, 530 A.2d 596 (1987).

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some

contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose (citation and internal quotation marks omitted." *De La Concha of Hartford, inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 433, 849 A.2d 382 (2004).

> Disagreement between an insurer and insured as to coverage of the appropriate amount to which the insured is entitled is not equivalent to bad faith and, standing alone, does not evince dishonest purpose. The insured's demand may itself be excessive and unwarranted, or the insurer's rejection of the claim may be erroneous but honestly held.

> With respect to the implied covenant of good faith and fair dealing, "[a] party to a contract is entitled to take reasonable positions to protect its interests and to resist efforts that would compromise its legal rights," *Elliot v. Staron,* 46 Conn.Sup. 38, 48 (1997), affirmed 54 Conn.App. 532 (1999); appeal dismissed, 255 Conn. 18 (2000). Reasonable measures may include the refusal to pay benefits to an insured. *Sansone v. Nationwide Mutual Fire Insurance Co.,* 62 Conn.App. 526 (2001).

*Jones v. Standard Fire Ins. Co.*, 2013 WL 541015 (Conn.Super. 2013).

"Evidence of a mere coverage dispute…will not demonstrate a breach of good faith and fair dealing." *Uberti v. Lincoln Nat'l Life Ins. Co.*, 144 F.Supp. 2d 90 (D. Conn. 2001).

The evidence and testimony reveals that this lawsuit concerns a mere coverage dispute. Furthermore, the plaintiffs never presented a "concrete decay" or "collapse" claim to Liberty. Instead, on December 14, 2012, Mr. Roberts reported that he had observed cracks in his walls and that his walls were "disintegrating". **Ex. F**. Mr.

Roberts had already consulted with Mr. Soucy—who informed him of the alleged problem with Mottes concrete at his and other properties in the area—prior to reporting his claim. **Ex. K**, p. 34. Mr. Roberts had already retained Attorney Parker prior to presenting his claim. **Ex. K**, p. 35-36. Attorney Parker was the plaintiffs' attorney in *Bacewicz*.

There is no mention in the claim notes of Mottes concrete, a progressive collapse condition, other "concrete decay" claims, or a common problem occurring in the plaintiffs' basement walls which was similarly afflicting numerous properties in the vicinity of their property. **Ex. E.** Mr. Roberts made no mention of any of this in his claim notice. **Ex. F**.

Thus, despite this superior knowledge of what his actual claim was at the time it was presented, Mr. Roberts never informed Liberty of similar claims in the Tolland County area or vicinity of his property. He never mentioned Mottes concrete. Neither the plaintiffs nor their attorneys presented this collapse coverage theory during the claim process. Mr. Roberts did not mention that his attorney had tried a case with identical allegations to successful verdict. Instead of providing Liberty with all pertinent information, the plaintiffs initiated suit based upon a claim which they never presented to their insurer. As such, it appears that the plaintiffs intentionally obscured their actual claim so that they could "up the ante" in litigation with baseless extra-contractual allegations against Liberty.

Courts in Connecticut are well-aware of this frequent and unfortunate practice in first-party actions:

> "…[F]irst-party actions against insurers…are increasingly accompanied by bad faith claims and CUTPA/CUIPA actions.  Not infrequently, these additional claims are themselves brought in bad faith, to 'up the ante' at pretrial and trial by increasing the insurer's exposure; to exponentially increase the scope of discovery, with the hope of obtaining the insurer's entire file, including its work-product investigation; and for purposes of trial strategy.  In such case, the prejudice to the defendant is evident."
>
> *Khanthavong v. Allstate Ins. Co.*, 1996 WL 704366 (Conn. Super 1996).

In response to the plaintiffs' claim, Liberty retained a professional engineer, Mr. Berry.  Mr. Berry inspected the property on January 3, 2013 and authored a report dated January 4, 2013.  Mr. Berry noted "various deficiencies" in the construction of the basement walls and that the walls were built "without adequate reinforcing bars to control cracks and resist lateral soil pressure."  **Ex. G**, p. 2.  Mr. Berry opined that the walls remained plumb.  **Ex. G**, p. 2.

In reliance on Mr. Berry's report, Liberty denied the claim on January 10, 2013 because the "policy does not afford coverage for damages that are a result of faulty construction."  **Ex. H**, p. 1.  Liberty's denial also quoted, but did not explicitly apply, additional provisions which appeared directly applicable to the plaintiffs' claim and it reserved its rights to reconsider its coverage decision.  **Ex. H**, p. 1-2.  Liberty did not conduct itself in bad faith.  It received a claim for cracks in a foundation, it swiftly

dispatched a professional engineer to inspect it, and it relied upon his professional opinion in reaching its claim determination.[13]

The plaintiffs have proffered no evidence for why Liberty should have considered the "collapse" provision of the Policy when evaluating the claim. A collapse was not reported and their plaintiffs' collapse theory was never presented. Liberty had a report from its retained professional engineer that the foundation was structurally sound. Further, even if it would have considered the "collapse" provision, it would have noted that loss to a "foundation" or "retaining wall" is not covered unless it is a direct result of the collapse of a building. **Ex. A,** p. 5 of 18. This Court found the defendant's interpretation of these terms entirely reasonable in *Karas*, 33 F.Supp.3d at 116. This litigation involves a mere coverage dispute which cannot form the basis for bad faith liability.

Moreover, the plaintiffs do not know which insurer is liable under their collapse theory, as demonstrated by their suit against their prior insurer, Amica, for the same claimed loss. The plaintiffs cannot credibly allege that Liberty acted in bad faith in denying their claim when they are unsure which insurer, if any, is liable for covering it.

---

[13] *See Kim v. State Farm Fire and Cas. Co.*, 2015 WL 6675532 (D.Conn. 2015)(Bad faith count dismissed in an identical claim where engineer inspected loss, insurer relied on his findings in denying coverage, insurer quoted and applied policy language apparently directly applicable to the claim, quoted but did not apply additional provisions directly relevant to the claim, and reserved the right to reconsider its coverage decision).

Based on all of the above, Liberty respectfully requests that summary judgment enter in in its favor as to Count II.

**D.** **Liberty is entitled to summary judgment on the CUTPA/CUIPA counts:**

The plaintiffs' CUTPA/CUIPA counts are similarly meritless for all of the reasons detailed in the preceding subsection concerning the bad faith count.  At the outset, the defendant notes that with respect to insurance claims, a private right of action pursuant to CUTPA exists only in the context of a violation of CUIPA.  *State v. Acordia, Inc.*, 310 Conn. 1, 37, 73 A.3d 711 (2013).

In order to prevail under CUTPA/CUIPA, the plaintiffs must plead and prove that Liberty engaged in a general business practice of unfair claims handling practices. *Lees v. Middlesex Ins. Co.,* 229 Conn. 842, 847-49, 643 A.2d 1282 (1994). Connecticut courts have rejected plaintiffs' attempts to establish a "general business practice" by string-citing other cases that include bad faith allegations. *See Ferrante v. Allstate Prop. & Cas. Ins. Co.*, 2011 WL 3890988, at *2 (Conn. Super. 2011)("The plaintiff's string citation merely stands for the proposition that the defendant has been sued for bad faith settlement practices. Without more, this represents only a legal conclusion and does not constitute proper fact pleading . . .")  Indeed, the plaintiffs' string citation in ¶ 51 of the complaint merely stands for the proposition that their attorneys frequently advance baseless extra-contractual counts against insurers.  *See also*, *Charter Oak Fire Ins. v. Blue Sky Part.*, 2001 WL 1178318 (Conn. Super.

2001)(motion to strike granted where allegations of general business practice were based on three pending lawsuits); *Ellison v. Great Am. Spirit Ins. Co.*, 2006 WL 3491242 (Conn. Super. 2006)("Merely alleging that other lawsuits have been filed against the defendants is insufficient."); *Rams II, LLC v. Mass. Bay Ins. Co.*, 2015 WL 3554789 (Conn. Super. 2015)("Citations to other cases in a cause of action attempting to plead a general business practice in violation of CUIPA are proper only if the decision maker in those cases found the defendant to be in violation of CUIPA.").

The plaintiffs have failed to reference a single matter in which a decision maker found Liberty to be in violation of CUIPA.  Furthermore, the CUTPA/CUIPA counts detail their lack of understanding of the Insurance Service Office, Inc. ("ISO") and its relationship with Liberty. Liberty did not have knowledge of *Bacewicz* during its claim evaluation.  This is confirmed by the lack of any mention of  *Bacewicz* in the claim notes.  **Ex. E**.  There is also no mention of any other similar claims in the claim notes **Ex. E.**  The denial letter and the absence of references to other claims clearly establishes that Liberty evaluated this claim on its own merits and without consideration given to any other claim. **Ex. E** and **Ex. H.**

Moreover, the plaintiffs' allegation in ¶ 46 of the complaint that Peerless obtained knowledge from ISO of other insurers' attempts to deny coverage in these self-termed "concrete decay" claims is similarly unfounded.  The listed excluded causes in that paragraph are commonly applicable policy exclusions that no insurer

27

would have to rely upon ISO to provide.  Again, there are is no evidence that any information was provided by ISO in relation to this claim.  Moreover, Mr. Soucy testified that foundation walls break for a number of reasons. **Ex. O,** pp. 47 and 71. Thus, his testimony supports Liberty's contention that there was no reason to link this claim to any other claim.  Liberty's policies utilize ISO forms.[14]  ISO does not provide it with information about "concrete decay" claims or the prevalence of them in northeastern Connecticut.

As noted above, Liberty had no reason to link this case to its claims handling decisions in the other matters cited in the complaint.  The plaintiffs have no evidence that other claims were considered or relied upon by Liberty during its claim evaluation. All they have to support their CUTPA/CUIPA claim is that their attorneys have brought multiple identical lawsuits relatively contemporaneously.

The plaintiffs' CUTPA/CUIPA claim is premised solely on the alleged unfair denial of coverage for the plaintiffs' "collapse" claim.  Thus, there can be no violation of CUTPA/CUIPA unless it is first established that both the underlying claim is covered and was presented to the insurer.  Since the underlying "collapse" claim is not covered

---

[14] "Insurance Services Office, Inc., an association of approximately 1400 domestic property and casualty insurers …is the almost exclusive source of support services in this country for…insurance.  [ISO] develops standard policy forms and files or lodges them with each [s]tate's insurance regulators; most…insurance written in the United States is written on these forms."  *Capstone*, 308 Conn. at n. 6.

and was never presented to the defendant during the claims process, the denial of coverage based upon the claim made is not a violation of CUTPA/CUIPA.

The plaintiffs have failed to establish any general business practice, yet alone one of denying claims in which liability is reasonably clear.  Their suit against Amica for the same loss was a tacit admission that it is not even clear to them which insurer, if any, should cover their claim.

## III.   **CONCLUSION**:

For the foregoing reasons, it is respectfully requested that the motion for summary judgment be granted as to all counts.

> DEFENDANT,
> LIBERTY MUTUAL FIRE INSURANCE
> COMPANY
>
>
> By__/s/ Kieran W. Leary_____
>     Philip T. Newbury, Jr. (ct05283)
>     Kieran W. Leary (ct29484)
>     Howd & Ludorf, LLC
>     65 Wethersfield Avenue
>     Hartford, CT  06114-1121
>     (860) 249-1361
>     (860) 249-7665 (Fax)
>     E-Mail:  pnewbury@hl-law.com
>     E-Mail:  kleary@hl-law.com

## <u>CERTIFICATION</u>

This is to certify that on **June 16, 2016**, a copy of the foregoing **Memorandum of Law in Support of Motion for Summary Judgment** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Michael D. Parker, Esquire
Jeffrey R. Lindequist, Esquire
One Monarch Place
Suite 2220
Springfield, MA  01144
**(413) 736-4101**
**(413) 736-4582 fax**
**mparker@mdparkerlaw.com**
**jlindequist@mdparkerlaw.com**

_____/s/ Kieran W. Leary_____
Kieran W. Leary