**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF CONNECTICUT**

```
**************************************************
                                    *
MICHAEL ROBERTS                     *
ANNETTE ROBERTS                     *
                Plaintiffs          *
                                    *        Civil Action No.
VS.                                 *        3:13-cv-00435 (SRU)
                                    *
LIBERTY MUTUAL FIRE INSURANCE COMPANY *      August 8, 2016
                Defendant           *
                                    *
**************************************************
```

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

NOW COME the plaintiffs, Michael Roberts and Annette Roberts (hereinafter collectively referred to as "the Robertses"), and submit the following Memorandum of Law in Opposition to the defendant, Liberty Mutual Fire Insurance Company's (hereinafter "Liberty Mutual") Motion for Summary Judgment.

**STATEMENT OF FACTS**

The Robertses built their home at 34B Hopyard Road, Stafford Springs, Connecticut in 1990. (Ex. D, p. 1-2; Ex. K, p. 6; Ex. DD, p. 6). The concrete used to construct the basement walls of the home was supplied by the JJ Mottes Company. (Ex. K, p. 42-43; Ex. DD, p. 35). The Robertses perceived no problems with the basement walls of their home until July of 2012, when Mr. Roberts discovered a large crack in one of the basement walls of his home. (Ex. K, p. 24-25; Ex. DD, p. 12). The Robertses discovered a small pool of water and, due to its small size

ORAL ARGUMENT REQUESTED

and location, initially believed the problem to be a leaky pipe or a leak from the furnace.  (Ex. K, p. 24-25; Ex. DD, p. 12).  It was investigating the source of the small amount of water that revealed the initial crack observed by the Robertses.  (Ex. K, p. 24-25; Ex. DD, p. 12).  This cracking struck the Robertses as odd due to the spider web pattern of the cracking.  (Ex. DD, p. 12-13).

The Robertses were not overly concerned by the presence of the cracking upon initial discovery, however, they did solicit repair estimates for the purpose of preventing potential water intrusion in the future.  (Ex. K, p. 27-29).  To aid the contractors in their inspection, Mr. Roberts removed a series of shelves that obscured most of the interior basement walls of the home.  (Ex. K, p. 27).  The Robertses were given a number of estimates for cosmetic/water prevention patchwork on the cracks, however, one contractor refused to provide an estimate as he felt that the situation was beyond his firm's capabilities.  (Ex. D, p. 8, Answer to Interrogatory No. 20; Ex. K, p. 30-32).  While this contractor did not feel he could address the situation, he did recommend a contractor experienced with the particular condition – Dean Soucy.  (Ex. K, p. 30-33; Ex. DD, p. 27).  The Robertses took the recommendation of this contractor and contacted Mr. Soucy.  (Ex. K, p. 32-33).  Mr. Soucy observed the basement walls of the Robertses home and informed them that water was not an issue, but that the basement walls were deteriorating and needed to be replaced in their entirety.  (Ex. K, p. 33; Ex. DD, p. 27-28, 32).

The Robertses initially insured their home with a Travelers subsidiary and then with Amica Mutual Insurance Company.  (Ex. B).  The Robertses have insured with Liberty Mutual since October 9, 2007.  (Ex. AA, Declarations).  The homeowner's policies issued by Liberty Mutual provide coverage for "direct physical loss to covered property involving collapse of a

building or any part of a building caused only by one or more of the following:…b. Hidden decay…f. Use of defective material or methods in construction, remodeling, or renovation….” (Ex. A, Form HO 00 03 04 91, p. 5 of 18, as amended by Form FMHO 3223 02 12, p. s 2 of 4; Ex. AA, Form HO 00 03 04 91, p. 5, as amended by form HO 01 06 06 97, p. 1 of 4).   The policies issued by Liberty Mutual do not define the term "collapse."  (Ex. A, Form HO 00 03 04 91, p. 5 of 18, as amended by Form FMHO 3223 02 12, p. s 2 of 4; Ex. AA, Form HO 00 03 04 91, p. 5, as amended by form HO 01 06 06 97, p. 1 of 4).

The Robertses reported the claim at issue to Liberty Mutual on December 14, 2012.  (Ex. E, p. 2).   Liberty Mutual first dispatched a field adjuster to make a visual inspection of the property.  (Ex. E, p. 2).   Liberty Mutual then dispatched an engineer, Michael J. Berry, P.E., to inspect the Robertses' home on January 3, 2013.  (Ex. G).   Mr. Berry authored a report dated January 4, 2013, which was transmitted directly to Liberty Mutual.  (Ex. G).   Liberty Mutual denied the Robertses' claim by way of letter dated January 10, 2013 on the grounds that the damage suffered to the basement walls of their home was caused by "faulty construction."  (Ex. H, p. 1).   In its denial letter, Liberty Mutual cited a number of additional exclusions not related to the "faulty construction" of the basement walls of the home.  (Ex. H).

Following Liberty Mutual's denial of the Robertses' claim, the basement walls were inspected by David Grandpré, P.E., on June 24, 2013.  (Ex. BB, p. 1).   Mr. Grandpré found that the structural integrity of the Robertses' basement walls was, at the time of his inspection, substantially impaired.  (Ex. BB, p. 3-4).   The extensive pattern of horizontal and vertical cracking and deterioration throughout the basement wall structure suggests one of two (2) possible chemical reactions, an alkali-silica reaction or the oxidation of iron sulfide in the

aggregate used to make the concrete.[1]  (Ex. BB, p. 3).  Both reactions occur within the concrete on a microscopic level and cause the concrete to break down internally.  (Ex. BB, p. 3).  At the time of the Grandpré inspection, the concrete was so impaired that the basement walls were incapable of performing their intended functions of supporting the wooden portion of the home. (Ex BB, p. 4).  Mr. Grandpré has further opined that the chemical reaction cannot be arrested and that the only viable remedy to this condition is the complete removal of the basement walls and replacement with new walls formed with good and sufficient concrete.  (Ex. BB, p. 4).

## ARGUMENT

The Robertses suggest that Liberty Mutual has not met its burden with respect to the summary judgment sought.  Rather, the Robertses suggest that the record on summary judgment clearly shows that there has been a collapse of the basement walls of their home, which collapse was caused by a covered peril and not excluded by any of the policy provisions referenced by Liberty Mutual.  To the extent that the record does not clearly demonstrate such a covered collapse, this lack of clarity arises from factual issues that must be resolved by a jury – precluding summary judgement.  Furthermore, the record on summary judgment suggests that Liberty Mutual acted in bad faith and in violation of Connecticut's various consumer protection statutes in denying the Robertses' claim for coverage and forcing them to litigate for the benefits of the insurance they purchased from Liberty Mutual.

## I.    Standard for Ruling on a Motion for Summary Judgment.

Liberty Mutual's representation of the standard used when ruling on a motion for summary judgment is largely complete.   However, the Robertses wish to offer some

---

[1] The precise chemical reaction at work in the Robertses' home has been identified as oxidation of iron sulfides. (Ex. L).

clarifications to Liberty Mutual's recitation.  Liberty Mutual, as the moving party, has the burden of proving that it is entitled to summary judgment.  *United Transp. Union v. Nat'l R.R. Passenger Corp,* 588 F.3d 805, 809 (2d Cir. 2009).  To meet this burden, the moving party must demonstrate that there are no genuine issues of material fact.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  It is only when the movant satisfied this burden that a "limited burden of production shifts to the nonmovant." *Cobb v. Metro-North R. Co.,* 41 F.Supp.3d 145, 149 (D.Conn. 2014).  In determining whether the movant has sustained its burden of demonstrating an absence of factual issues, "the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).

"When ruling on a motion for summary judgment, the court must respect the province of the jury."  *Cobb v. Metro-North R. Co.,* 41 F.Supp.3d 145, 149 (D.Conn. 2014).  Therefore, when deciding a motion for summary judgment the court must not decide issues of fact.  *Id. citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  "It is well-established that '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.'"  *Id.*   "Thus, the trial court's task is 'carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution.'"  *Id. citing Gallo Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir. 1994).

II.     **There is Coverage under the Policy Because an Insured Building Collapsed.**

The Robertses suggest that the threshold question in this case is whether there has been a

"collapse of a building or any part of a building" such that the Additional Coverages section, of the homeowner's policy, para. 8 (Collapse) would be triggered.  Liberty Mutual, in an attempt to take advantage of the limiting language within para. 8, begins its substantive argument by trying to differentiate between the term "basement walls," "foundation walls," and "retaining walls." (Liberty Mutual's Memo., p. 10-16).  Their approach is understandably, perhaps intentionally, somewhat confusing.  To ascertain whether coverage is provided by para. 8, one must first determine whether the insured *building or any part of the building* has "collapsed."  (Ex A, Form HO 00 03 04 91, p. 5 of 18, as amended by FMHO 3223 02 12, p. 2 of 4; Ex. AA, Form HO 00 03 04 91, p. 5, as amended by form HO 01 06 06 97, p. 1 of 4).[2]

The question of collapse has both factual and legal elements.  Although Liberty Mutual makes little reference to the extent of the deterioration, there is no real question but that the concrete walls of the basement of the Robertses' home have decayed and broken apart in a manner completely uncharacteristic of ordinary concrete.  (Ex. BB, p.3).  After inspection of the condition, the Robertses' engineering expert, David Grandpré, concluded that the "concrete basement walls [of the Robertses' home] were substantially structurally impaired."  (Ex BB, p. 3).  Grandpré opines that the extensive pattern of horizontal and vertical cracking and deterioration throughout the wall structure suggested one of two (2) possible chemical reactions, an alkali-silica reaction or the oxidation of iron sulfide in the aggregate used to make the concrete.  (Ex. BB, p. 3).  Both reactions occur within the concrete on a microscopic level, which causes the concrete to break down internally.  (Ex. BB, p. 3).  Irrespective of the precise reaction

---

[2] In advancing their claim against Liberty Mutual, the Robertses attached to the complaint the only complete Liberty Mutual Policy in their possession, for the 2007-2008 policy year.  Ex. AA, Declarations.  Liberty Mutual has offered the 2012-2013 policy in support of their motion for summary judgment.  Ex. A, Declarations.  Attaching a later policy to the motion for summary judgment while, at the same time, arguing that the loss occurred earlier in time seems somewhat inconsistent.  In any event, the collapse provisions within both policies are otherwise identical.

occurring, the end result has been that the concrete of the basement walls were so impaired that the basement walls were incapable of performing their intended functions of supporting the wooden portion of the home.  (Ex BB, p. 3-4).

The evidence further suggests that this collapse was the result of a covered cause.  The homeowner's policy issued by Liberty Mutual provides coverage for "direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following…b. Hidden decay…f. Use of defective material or methods in construction, remodeling, or renovation."  (Ex. A, Form HO 00 03 04 91, page 5 of 18, as amended by FMHO 3223 02 12, p. 2 of 4; Ex. AA, Form HO 00 03 04 91, p. 5, as amended by form HO 01 06 06 97, p. 1 of 4).  The chemical reaction occurring within the walls of the home is not only a form of hidden decay, but also the result of improper materials used in the construction of the basement walls.[3]  (Ex. BB, p. 3).

In light of the severely compromised physical condition of the basement walls, the legal element arises as to whether a "collapse" has occurred.  Admittedly, there was not the kind of catastrophic "tumbling down" or "falling in" that one often associates with the word "collapse."  Although in other cases, insurers have argued that a "collapse" sufficient to invoke policy coverage must involve a catastrophic "falling down," the majority of the courts construing homeowner's policy usage of the term have disagreed.  The Supreme Court of Connecticut stands in the foreground of that majority, having ruled in 1987 that collapse coverage should be afforded where there has been a "substantial impairment of the structural integrity of a building."

_____

[3] While Liberty Mutual's expert witness does not agree that the structural integrity of the basement walls of the home has been substantially impaired, his suggestion that the cause of the damage was failure to properly reinforce the concrete, which lead to the finding of "faulty construction," would still implicates the collapse coverage as a "defective…method…in construction."  (Ex. G; Ex. A, Form HO 00 03 04 91, page 5 of 18, as amended by FMHO 3223 02 12, p. 2 of 4; Ex. AA, Form HO 00 03 04 91, p. 5, as amended by form HO 01 06 06 97, p. 1 of 4).

*Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987).

The reasoning behind the court's conclusion is straight-forward.  To require an owner who knows of a substantial impairment to the integrity of the insured structure to await complete, catastrophic destruction before losses are to be covered would subvert the insured's duty to mitigate damages and avoid economic waste.  *Id.* at 253 n.2; *Campbell v. Norfolk & Dedham Fire Ins. Co.*, 682 A.2d 933 (R.I. 1996).  Certainly, the word "collapse" can be thought of as a sudden and complete catastrophe, but it is also defined as a "breakdown in vital energy, strength or stamina…"  *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 250 (1987) *citing* Webster, Third New International Dictionary.  The *Beach* Court acknowledged that "collapse" could be defined either as a sudden event or a gradual breakdown of a structural strength.  *Id.*  In either case, under common principles of insurance law, the insurer would have the obligation to define collapse as a sudden event, if that was the meaning it sought to convey.  *Id.* at 251; *Mills v. Colonial Penn Ins. Co.*, 47 Conn. Supp. 17, 20-21 (Conn.Super. 2000).  Liberty Mutual made no attempt to do so in the policies issued to the Robertses.  (Ex. A, Form HO 00 03 04 91, page 5 of 18, as amended by FMHO 3223 02 12, p. 2 of 4; Ex. AA, Form HO 00 03 04 91, p. 5, as amended by form HO 01 06 06 97, p. 1 of 4).

Combining the factual description reported by Grandpré, with the *Beach* definition of collapse, the conclusion seems inescapable that the building or a part of the building had collapsed by October of 2012 – when Mr. Roberts reported discovery the condition to his engineering consultant – and certainly by June of 2013 when Mr. Grandpré inspected the premises.  (Ex. BB, p. 1).  Nowhere in the policy are the basement walls excluding from the

definition or meaning of the word "building."[4]  The deterioration of the basement walls impaired the structural integrity of not only the walls themselves, but of the portions of the building above. Furthermore, Liberty Mutual offers no contradictory opinion with respect to the structural integrity of the Robertses' home in support of its motion for summary judgment.[5]  Of course, any such contradictory opinion would simply create a material issue of fact precluding summary judgment as to the issue of collapse.

### III.    The Term "Foundation" is Ambiguous.

Rather than contradict the Robertses' engineer's opinion that the structural integrity of the basement walls of the Robertses' home is substantially impaired and, therefore, in a state of collapse, Liberty Mutual proffers the exclusion with respect to the collapse of a "foundation." Contrary to Liberty Mutual's assertions in this regard, there can be no reasonable doubt but that the basement walls of the Robertses' home are "part of [the] building" for purposes of the "collapse" provision in the policy.  (Ex. A, Form HO 00 03 04 91, page 5 of 18, as amended by FMHO 3223 02 12, p. 2 of 4; Ex. AA, Form HO 00 03 04 91, p. 5, as amended by form HO 01 06 06 97, p. 1 of 4).  The concrete of these walls has been alleged to have failed to the degree that there has been a "substantial impairment to the structural integrity" of the entire building and, therefore, they have collapsed.  See *Beach v. Middlesex Assurance Co.*, 205 Conn. 246, 252 (1987).  Where all or part of the building has collapsed due to an enumerated cause, coverage of

---

[4] In fact, the policy does flesh out the term "building" in the provisions detailing how the replacement cost of a building is determined.  (Ex. A, Form HO 00 03 04 91, Section I – Conditions, para. 3.B.(3), p. 9 of 16; Ex. AA, Form HO 00 03 04 91, Section I – Conditions, para. 3.B.(3), p. 9).  Under this calculus the building includes the basement walls and floors.  *Id.*

[5] In fact, Liberty Mutual has attached its engineering expert's report to its motion for summary judgment.  Which report opines that the structural integrity of the Robertses' home has not been impaired.  Ex. G.  However, Liberty Mutual does not appear to offer this report in an attempt to contradict Mr. Grandpré's analysis of the home's structural integrity.

the loss becomes the obligation of the insurer.  Liberty Mutual seeks to avoid that obligation by suggesting that the basement walls are either part of the "foundation" or constitutes a "retaining wall."  This argument ignores not only precedent of this Court, but also the accepted principles for interpretation of insurance policy terms.

The standards for construing the terms of an insurance policy in Connecticut are clear. Construction of an insurance policy involves a determination of the parties' intent as expressed by the policy language.  *Conn. Ins. Guar. Ass'n v. Fontaine,* 278 Conn. 779, 784 (2006). However, when performing this analysis, the court must construe the policy terms "as laymen would understand them and not according to the interpretation of sophisticated underwriters." *Vermont Mut. Ins. Co. v. Walukiewicz,* 290 Conn. 582, 592 (2009).  In particular, "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view."  *Id.*  Where policy terms are unambiguous those terms are accorded their natural and ordinary meaning.  *Jacaruso v. Lebski,* 118 Conn. App. Ct. 216, 233 (2009). However, where a term is susceptible to more than one reading, the term is construed against the insurance company as they drafted the policy terms.  *New London County Mut. Ins. Co. v. Zachem,* 145 Conn. App. Ct. 160, 166 (2013).  Ambiguous insurance policy terms are not only construed against the insurance company, they are construed in favor of coverage.  *Middlesex Ins. Co. v. Mara,* 699 F.Supp.2d 439, 446-447 (D.Conn. 2010); *Beach v. Middlesex Assurance Co.,* 205 Conn. 246, 249-250 (1987).

This Honorable Court has specifically found that the term "foundation," as used in an identical collapse clause, was "reasonably susceptible to more than one meaning" and was, therefore, ambiguous on numerous occasions. *Bacewicz v. NGM Ins. Co.,* 2010 WL 3023882, *

4 (D.Conn. 2010); *see also Roberge v. Amica Mut. Ins. Co.,* 2015 WL 9480008, *2-4 (D.Conn. 2015);[6] *Mensher v. Liberty Mut. Fire Ins. Co.,* Docket No. 3:15-cv-01007 (WWE), attached hereto as Exhibit CC; *Metsack v. Liberty Mut. Fire Ins. Co., et al.,* 2015 WL 5797016, *5-8 (D.Conn. 2015); *Gabriel v. Liberty Mut. Fire Ins. Co.,* 2015 5684063, *2-4 (D. Conn. 2015); *Karas v. Liberty Ins. Corp.,* 33 F.Supp.3d 110, 115-116 (D.Conn. 2014); *Belz v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 163-164 (D.Conn. 2014).   In Bacewicz, this Honorable Court denied summary judgment for the insurer by holding that "a reasonable jury could find that the basement walls of the [plaintiffs'] house did not constitute the 'foundation' of the house." *Bacewicz v. NGM Ins. Co.,* 2010 WL 3023882, * 4 (D.Conn. 2010).   In *Roberge, Mensher, Metsack, Gabriel, Karas,* and *Belz,* this Honorable Court denied motions to dismiss, finding the term foundation to be ambiguous.   *Roberge v. Amica Mut. Ins. Co.,* 2015 WL 9480008, *2-4 (D.Conn. 2015); *Mensher v. Liberty Mut. Fire Ins. Co.,* Docket No. 3:15-cv-01007 (WWE), attached hereto as Exhibit CC; *Metsack v. Liberty Mut. Fire Ins. Co., et al.,* 2015 WL 5797016, *5-7 (D.Conn. 2015); *Gabriel v. Liberty Mut. Fire Ins. Co.,* 2015 5684063, *2-4 (D. Conn. 2015); *Karas v. Liberty Ins. Corp.,* 33 F.Supp.3d 110, 115-116 (D.Conn. 2014); *Belz v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 163-164 (D.Conn. 2014).   Not only do these matters involve substantially identical policy language, they also involve identical damage caused by the very same condition present in the Robertses' home.   The Robertses suggest that this Honorable Court should follow its prior construction of this policy language and find the term "foundation" ambiguous.

---

[6] Liberty Mutual suggests that *Roberge* "inferred that [this Honorable Court's] prior resolution of a purported contractual ambiguity" with respect to the term "foundation."   (Liberty Mutual's Memo., p. 10-11).   Respectfully, Liberty Mutual makes much of the phrase "Although defendant *may* have a strong argument in its favor...." *Roberge v. Amica Mut. Ins. Co.,* 2015 WL 9480008, *3 (D.Conn. 2015)(emphasis added).   In any event, *Roberge* followed prior precedent and found that the term "foundation" was ambiguous.   *Id.*

Liberty Mutual attempts to assail the sound reasoning of the *Bacewicz* decision by claiming flawed the Alabama Supreme Court decision cited by this Honorable Court in finding the term "foundation" ambiguous.  The Alabama Supreme Court had construed a nearly identical collapse provision and found the term "foundation" to be ambiguous.  *Turner v. State Farm Fire and Cas. Co.,* 614 So.2d 1029, 1030 (Ala. 1993).  In particular the court found that the term "foundation" could mean the "three-by-three foot piece of concrete under the basement wall" or "footings" which support the entire structure.  *Id.*  Liberty Mutual opines that because the *Turner* court did not pluck the notion that the footing is a foundation from a dictionary, the reasoning is somehow flawed.  However, the notion that the term "foundation" refers to the footing of a structure is supported in a number of dictionaries that define the term as "the lowest load-bearing part of the building."  *See* Oxford American Dictionary and Thesaurus, 2003; *see also Belz v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 163-164 (D.Conn. 2010)(quoting the Oxford American Dictionary and Thesaurus definition of the term "foundation").  In homes such as the Robertses,' the lowest load-bearing part of the structure would be the footing upon which the basement walls rest.

Liberty Mutual attempts to slip past this Honorable Court's prior treatment of the nearly identical foundation exclusions by reference to policy language unrelated to the collapse provision which contains both the terms "foundation" and "footings."  This Honorable Court has also had the occasion to construe insurance policies that contain reference to "footings" and, even in that case, has still found the term "foundation" ambiguous with respect to collapse coverage.  *See Metsack v. Liberty Mut. Fire Ins. Co.*, *et al.,* 2015 WL 5797016, *6 (D.Conn. 2015).  In *Metsack,* this Honorable Court found that "the separate usage of 'footings' and

'foundation' elsewhere in the policy is not dispositive here, because a house may or may not have a separate 'footing' and 'foundation' depending upon its construction." *Id.* This Honorable Court found that the typical construction methods of this time called for "footings" to be a separate structural element and that a reasonable trier of fact could conclude that the "footings" of such a home could be the "foundation." *Id.* This Court further explained that "[t]his interpretation would not render either term superfluous, because, there may be circumstances in which a house has foundational walls, supported by footings, without any basement." *Id.*

In *Metsack*, this Honorable Court also found the notion that the basement walls are part of the "building" and not the "foundation" to be further supported by the policy language concerning the method of calculating the replacement value of a covered "building." To determine the replacement cost of a "building" the policy requires that you "not include the value of: (a) [e]xcavations, footings, foundations, piers or any supports which are below the undersurface of the lowest *basement floor*…." (Ex. A, Form HO 00 03 04 91, Section I – Conditions, para. 3.B.(3), p. 9 of 16; Ex. AA, Form HO 00 03 04 91, Section I – Conditions, para. 3.B.(3), p. 9)(emphasis added). Walls under the policy are considered "foundation walls" only if there is "*no basement.*" *Id.* (emphasis added).

This Honorable Court found that the provisions regarding the calculation of the replacement cost of a building suggests "two key concepts: *first*, that a foundation can exist 'below the undersurface of the lowest basement floor,' which implies that a basement wall and a foundation are not *always* one and the same, and *second*, that the policy in at least some capacity differentiates between homes constructed with and without a basement by distinguishing 'foundation walls ... if there is no basement' from 'foundations below the undersurface of the

lowest basement floor.'"  *Metsack v. Liberty Mut. Fire Ins. Co., et al.,* 2015 WL 5797016, *7 (D.Conn. 2015)(emphasis in the original).  The Robertses suggest that the reasoning of the *Metsack* decision is sound and that the mere reference to the term "footings" in other portions of the policy does not render the term "foundation" unambiguous.  Rather, the Robertses suggest that, at the very most, the language quoted by Liberty Mutual concerning "footings" serves only to introduce further ambiguity in the contract, which ambiguity must be construed against the insurer and in favor of coverage.  *Middlesex Ins. Co. v. Mara,* 699 F.Supp.2d 439, 446-447 (D.Conn. 2010); *Beach v. Middlesex Assurance Co.,* 205 Conn. 246, 249-250 (1987).

Liberty Mutual's also attempts to render the term "foundation" unambiguous is also completely unavailing.  Liberty Mutual cites to the *Parker* case, where the undersigned counsel litigated a similar case against his wife's insurer to cover damage identical to the Robertses' home.  What Liberty Mutual ignores about the *Parker* case is that the policy exclusion containing the terms "foundation" and "retaining wall" was not raised as a defense by the insurance company and was, therefore, not in issue.[7]  Rather, the sole issue on appeal was whether the suit limitation provision found in the *Parker* insurance policy barred the suit.  *Parker v. Worcester Ins. Co.,* 247 F.3d 1, 6 (1st Cir. 2001).  The same can be said of Liberty Mutual's reference to the terminology used by the *Beach* Court, as the "collapse" provision at issue in that matter did not contain the same exclusion now proffered and, therefore, there was no need for *Beach* to consider the ambiguity of the term "foundation" or any reason to pay heed to its use of

---

[7] The First Circuit Court of Appeals explicitly noted that the applicability of the "foundation" exclusion noted by Liberty Mutual was not briefed by the parties or decided by that court.  *Parker v. Worcester Ins. Co.,* 247 F.3d 1, 6 (1st Cir. 2001).  Setting aside the fact that this discussion was, therefore, dicta, Liberty Mutual ignores an important distinction in that matte discussion – that the exclusion for damage to the "foundation" was *not* the exclusion now offered by Liberty Mutual.  *Id.*  In fact, the First Circuit also noted the possibility that "the *Beach* case could be read to bypass this exclusion if the claim falls within Additional Coverage 8's provision for collapse."  *Id.*  It would seem that Liberty Mutual's reliance on the *Parker* case is flawed.

terminology in that regard.  *Beach v. Middlesex Mut. Assurance Co.,* 205 Conn. 246, 250 (1987).

In any event, the analysis of whether a contract term is ambiguous is not an exercise in ticking

off the number of times courts have used one term or another, rather, it involves determining

whether a term is "susceptible to more than one reasonable interpretation."  *Poole v. City of*

*Waterbury,* 266 Conn. 68, 88 (2003).  The Robertses suggest that the bulk of authority on this

point fully suggests that the term "foundation" is ambiguous.

## IV.    The Term "Retaining Wall" is Ambiguous.

Liberty Mutual also proffers as an operative exclusion to the uncontracted "collapse" of

the basement walls of the Robertses' home the notion that those basement walls are "retaining

walls."  This Honorable Court has given much the same treatment to this argument, and the

ambiguity of the term "retaining wall" as it has to the term "foundation."  The Robertses suggest

that the term "retaining wall" is reasonably susceptible to more than one meaning and must be

construed against Liberty Mutual and in favor of coverage.  *Middlesex Ins. Co. v. Mara,* 699

F.Supp.2d 439, 446-447 (D.Conn. 2010); *Beach v. Middlesex Assurance Co.,* 205 Conn. 246,

249-250 (1987).  A "retaining wall" is most commonly understood to be "a wall for holding in

place a mass of earth or the like, as at the edge of a terrace…"

http://dictionary.reference.com/browse/retaining+wall.  A "retaining wall" is not usually thought

of as part of a building.  Such a construction would be far more in line with the colloquial

understanding of a retaining wall as "freestanding wall that either resists some weight on one

side or prevents the erosion of an embankment."

http://www.britannica.com/EBchecked/topic/499892/retaining-wall.    Based on the above

definition, this Honorable Court has also found that the term "retaining wall" is ambiguous and

construed the term against Liberty Mutual in a number of related matters.  *Mensher v. Liberty Mut. Fire Ins. Co.,* Docket No. 3:15-cv-01007 (WWE), attached hereto as Exhibit CC; *Metsack v. Liberty Mut. Fire Ins. Co., et al.,* 2015 WL 5797016, *8 (D.Conn. 2015); *Gabriel v. Liberty Mut. Fire Ins. Co.,* 2015 5684063, *4 (D. Conn. 2015); *Karas v. Liberty Mutual Ins. Co.,* 33 F.Supp.3d 110, 115-116 (D.Conn. 2014); *Belz v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 164 (D.Conn. 2014).

Liberty Mutual's also attempts to use the *Beach* Court's reference to "retaining walls" in its opinion as dispositive on the issue.  However, use of the term "retaining walls," as with "foundation," is meaningless in the context of this case, as the policy at issue in *Beach* did not contain the exclusion for damage to a "foundation" or "retaining wall" at issue here.  Therefore, the ambiguity of the term "retaining wall" was not in issue and the opinion provides no meaningful instruction to this case.  Liberty Mutual cites *Nix* in support of its position, however, this case does not pass upon the ambiguity of the exclusion cited by Liberty Mutual.  *Nix v. State Farm Fire & Cas. Co.,* 444 Fed.Appx. 388 (11th Cir. 2011).  Simply put, *Nix* did not involve an analysis of coverage under the "collapse" coverage at issue here, but rather, that case involved an analysis of coverage under an unrelated policy exclusion not proffered by Liberty Mutual and not containing the term "retaining wall."  *Id.* at 389.  On the other hand, this Honorable Court has consistently held that the term "retaining wall," in the context of the additional coverage for "collapse," is ambiguous and must be construed against the insurer and in favor of coverage.  The Robertses suggest that the *Mensher, Metsack, Gabriel, Karas,* and *Belz* cases are far more instructive than the cases cited by Liberty Mutual which do not at all address the ambiguity of the proffered terms.

V.      **Extrinsic Evidence Cannot be Considered on Summary Judgment.**

The law of Connecticut clearly states that where a term in an insurance policy is reasonably susceptible to more than one reading, then that term is construed against the insurer and construed in favor of coverage. *Lexington Ins. Co. v. Lexington Healthcare Group, Inc.,* 311 Conn. 29, 38 (2014); *Liberty Mut. Ins. Co. v. Lone Star Industries, Inc.,* 290 Conn. 767, 795-796 (2009). Liberty Mutual asks this Honorable Court to ignore this longstanding principle of insurance policy construction by misrepresenting the import of a number of Connecticut Supreme Court cases. First, Liberty Mutual calls attention to the *Metropolitan* case in support of its notion that ambiguities in insurance policies are not construed against the insurance company, but must be resolved through extrinsic evidence. *Metro. Life Ins. Co. v. Aetna Cas. and Sur. Co.,* 255 Conn. 295, 306 (2001). However, Liberty Mutual ignores the salient fact that this case was between insurers and, therefore, completely distinguishable from this case. The *Metropolitan* Court explains that "[t]he contra-insurer rule does not apply, however, in actions by one insurer against another." *Id.* This case involves and insured suing its insurer and, therefore, the rule of contra proferentum still very much applies. Liberty Mutual next draws attention to the opinion of the Chief Justice of the Connecticut Supreme Court suggesting that extrinsic evidence must be examined to determine the intent of the parties before contra proferentum can be utilized. *Conn. Ins. Guar. Ass'n v. Drown,* 314 Conn. 161, 195-196 (2014). However, Liberty Mutual fails to note that the language it quotes from the Chief Justice was from a concurrence and that the majority recites the accepted principle, that where insurance policy terms are reasonably susceptible to two reasonable interpretations, the interpretation "which will sustain the claim and cover the loss *must,* in preference, be adopted." *Id.* at 188 (emphasis added).

Even so, Liberty Mutual's arguments with respect to the extrinsic evidence offered in its motion for summary judgment are fundamentally flawed. Setting aside its reliance on irrelevant extrinsic evidence – evidence from persons not a party to the contract at issue[8] – Liberty Mutual's request in this regard is actually fatal to its motion for summary judgment. The law is clear that where a term in a contract is ambiguous a court *may* accept extrinsic evidence as to the meaning of such a term. *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir. 1998). However, if a contract term is ambiguous and a court desires to examine extrinsic evidence as to the meaning of such an ambiguous term "then the contract's meaning becomes an issue of fact precluding summary judgment." *Id.* It is only where a contract term is unambiguous or where there exists no extrinsic evidence with respect to an ambiguity that summary judgment may be granted to a party. *Id.* Therefore, to the extent that Liberty Mutual wishes to rely on the proffered extrinsic evidence as to the terms "foundation" or "retaining wall," such reliance is fatal to its motion.

Even so, the Robertses suggest that the relevant extrinsic evidence noted by Liberty Mutual is far from dispositive. Rather, it highlights a further ambiguity in the heart of the "collapse" provision exclusions as a whole. The Rhode Island Supreme Court has also had occasion to address a nearly identical collapse provision to the one found in the Robertses' policies with Liberty Mutual. With the facts "on all fours" and with the same policy language, the Rhode Island Supreme Court found the whole exclusionary provision containing the term "foundation" to be ambiguous as the proffered application of the exclusion for damage to a

---

[8] Even if *Drown* requires the examination of extrinsic evidence, that matter is clear that such evidence must relate to the "mutual intent of the insured and the insurer as to the scope of coverage" and not parties unrelated to the contract. *Conn. Ins. Guar. Ass'n v. Drown,* 314 Conn. 161, 195 (2014). Most inappropriate, however, is Liberty Mutual's reference to the thoughts of an expert witness it has not disclosed in this action. (Liberty Mutual's Memo., p. 19, *citing* Exhibit N).

"foundation" would render the coverage illusory.  *Campbell v. Norfolk & Dedham Mut. Fire. Ins. Co.,* 682 A.2d 933, 936 (1996).[9]  The Court wrote that the insureds "had reason to believe they were purchasing a multi-peril contract of insurance that would cover the 'collapse of a building or *any part'* thereof caused by 'hidden decay.'"  *Id* (emphasis in the original).  The court rejected the insurer's argument that there must first be a "complete and total destruction of the (insured's) dwelling before coverage is triggered for loss to the foundation."  *Id.*  They went on to rule that if the insurer intended such a result, it could have easily stated that loss to a foundation is excluded unless caused by the collapse of the *entire* building.  *Id* (emphasis in the original).  The court also thought that requiring the entire building to collapse before covering the foundation "would render illusory the earlier policy provision purporting to insure against the risk of 'collapse of a building or any part of a building.'"  *Id.* at 936.

This Honorable Court has offered a similar sentiment in its analysis of the term "foundation" by looking at the term in the context of the whole exclusionary provision in which the term "foundation" is found.  *Metsack v. Liberty Mut. Fire Ins. Co., et al.,* 2015 WL 5797016, n2 (D.Conn. 2015).  Having found the term "foundation" ambiguous, the Court noted that "Plaintiffs' interpretation is potentially supported by the interpretative principal of *noscitur a sociis*, as 'the meanings of particular words may be indicated or controlled by associated words.'"  *Id. citing* 11 Williston on Contract § 32:6 (4th ed.).  In particular because "[t]he Policy exclusion applies to an: 'awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock.'

---

[9] The *Campbell* case does not quote the entire collapse exclusion.  In particular, the citation omits the terms following "foundation" in the portion of the opinion that quotes the collapse language.  *Id.* at 935.  However, it appears that this policy language in *Campbell* is identical to the standard form collapse clause and would, therefore, include the term "retaining wall," which immediately follows the term "foundation."

With the exception of 'foundation,' all of the terms used in the exclusion reference ancillary structures to the building itself." *Id.* As such, this Honorable Court found that "[a] reasonable trier of fact could conclude that the other terms used in the exclusion shed light on the term 'foundation' and suggest that term to be a reference to a more ancillary structure than the wall of a basement room." *Id.*

In this context, the relevant extrinsic evidence offered by Liberty Mutual in support of its position evaporates. Mr. Roberts testified at his deposition that he gave little thought to the meaning of the term "foundation" prior to reporting his claim to Liberty Mutual. (Ex. K, p. 57). While his understanding of the term "foundation" involves the concept of "holding up the house," Mr. Roberts also testified that he considers the basement a part of his home. (Ex. K, p. 57, 60). Moreover, Mr. Roberts testified that he considers the basement a part of the insured building. (Ex. K., p. 60). While Mrs. Roberts disagrees with her husband's notion that the basement walls are part of the "foundation" – believing the term to refer to the footings, which are the lowest load bearing elements of the structure – she readily agrees that the basement is a living area which is part of her home and part of the insured building. (Ex. DD, p. 46-47; Ex. EE). As a result, Liberty Mutual's reference to extrinsic evidence does not so much clarify the meaning of the term "foundation," but rather, exposes a larger ambiguity in the "collapse" provision as a whole. Which ambiguity must be construed against the insurers, in favor of coverage, and preclude summary judgment.

**VI.   Liberty Mutual Fails to Meet its Burden of Proving that the Loss Occurred Prior to the Period it Covered the Robertses' Home.**

Liberty Mutual attempts to avoid liability for the collapse of the Robertses' home by suggesting that the loss occurred prior to the time that it insured the Robertses' home. However,

Liberty Mutual offers no evidence to suggest that the loss occurred prior to October 2007 and, therefore, it does not meet its burden for demonstrating an absence of factual issues or that it is entitled to judgment as a matter of law.   Rather, Liberty Mutual relies on David Grandpré's analysis of *other* homes to assert that the Robertses cannot prove that the loss occurred during the period of time it covered the property.   Respectfully, the issue of when the loss occurred is inherently factual in nature and must be resolved by a jury.

As discussed more fully above, the Robertses' home has collapsed.  This collapse was the result of a covered cause – hidden decay or the use of defective materials in construction of the home.  (Ex. A, Form HO 00 03 04 91, page 5 of 18, as amended by FMHO 3223 02 12, p. 2 of 4; Ex. AA, Form HO 00 03 04 91, p. 5, as amended by form HO 01 06 06 97, p. 1 of 4).   The collapse itself occurred at the point in time when the structural integrity of the basement walls of the Robertses' home became substantially impaired.   *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987).   The determination of when the substantial impairment actually occurred is one of fact and requires expert analysis.   It is likely impossible to determine with any level of precision what day or month the substantial impairment occurred.    However, the Robertses' suggest that they need not point to a specific day, month, or even year to prove their case, but rather, they need only prove that it was more likely than not that the collapse occurred during the period that Liberty Mutual covered the Robertses' home.   *See Paese v. Hartford Life and Accident Ins. Co.,* 449 F.3d 435, 441 (2d Cir. 2006).

Respectfully, the timing of the substantial impairment to the structural integrity of the Robertses' home is only a part of the analysis as to what particular policy or policies provide coverage for the loss.   While the Robertses' suggest that the policy in force at the time that the

impairment to the structural integrity of their home became substantial, the law suggests that this is not the sole policy to be triggered by the condition. In *United Technologies* this Honorable Court predicted that Connecticut would utilize the multiple injury trigger in an instance of gradual or progressive loss. *United Technologies, Inc. v. American Home Assur. Co.,* 989 F.Supp. 128, 153 (D.Conn. 1997); *see also Travelers Cas. and Sur. Co. of America v. Netherlands Ins. Co.,* 312 Conn. 714, 754 (2014)(citing *United Technologies* with approval). Under this multiple injury trigger, those policies in effect where there has been an exposure to a cause of injury, an injury in fact, or when an injury manifests will be triggered. *Security Ins. Co. of Hartford v. Lubermens Mut. Cas. Co.,* 264 Conn. 688, n. 12 (2003).

While the Robertses would suggest that the point of substantial impairment would certainly be an "injury in fact" that policy is not the only policy potentially triggered in this situation. At a minimum that policy in effect when the problem manifested itself – when the Robertses knew or should have known that there was a significant structural flaw in their home – would also be implicated. *Security Ins. Co. of Hartford v. Lubermens Mut. Co.,* 264 Conn. 688, n. 12 (2003)(suggesting that manifestation occurs when a claim manifests itself or "becomes reasonably capable of diagnosis."); *see also Parker v. Worcester Ins. Co.,* 247 F.3d 1, 4 (1st Cir. 2001). The record on summary judgment is clear that the Robertses first perceived the cracking in their home in July of 2012. (Ex. C, ¶ 8; Ex. K, p. 24-25, 60-61; Ex. DD, 16). The record on summary judgment is also clear that the Robertses first notice that that cracking constituted a significant structural flaw would have occurred in late summer or early fall of 2012. (Ex. C, ¶16; Ex. D, p. 7, Answer to Int. No. 20; Ex. I, p. 11-12). As such, even assuming for the sake of argument that the substantial impairment of the structural integrity of the Robertses' home

occurred at some time prior to 2007, the 2012-2013 Liberty Mutual policy would still be triggered and, therefore, summary judgment is not appropriate on this point.

Furthermore, the Robertses' position that the collapse occurred during the time that Liberty Mutual insured their home has ample support in the record on summary judgment. There is no evidence in the record suggesting establishing that there was any cracking in the home prior to summer of 2012.[10]  (Ex. C, ¶ 8; Ex. K, p. 24-25, 60-61; Ex. DD, 16).  After the Robertses submitted the claim to Liberty Mutual, its engineer noted the presence of cracking during his inspection on January 3, 2013.[11]  (Ex. G, p. 1).  The walls were inspected by Mr. Grandpré on June 24, 2013.  (Ex. BB, p. 1).  Mr. Grandpré found that the structural integrity of the basement walls was, at the time of his inspection, substantially impaired.  (Ex. BB, p. 3-4).  Therefore, the collapse of the Robertses' home had occurred by June 24 of 2013.  *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987); (Ex. BB, p. 3-4).  Simply put, the only factual evidence of cracking and substantial impairment to the structural integrity of the home comes after the year 2007.  For that reason, the Robertses' suggest that Liberty Mutual has not demonstrated that the collapse occurred prior to the time that it covered the Robertses' home, nor does it offer evidence indicated that any policies issued by prior insurers have been triggered by the condition.

Liberty Mutual seeks to avoid this scenario, not by introducing contradictory engineering

---

[10] Mrs. Roberts testified that there was no indication of cracking prior to July of 2012, it was as if the cracks "just appeared." (Ex. DD, p. 16)

[11] Because Mr. Berry is of the opinion that the cracking was the result of premature backfilling, he was of the opinion that the cracking was present since construction. (Ex. G).  During Mr. Berry's deposition, it became clear that he is unfamiliar with the condition associated with the concrete supplied by the JJ Mottes Company.  (*See* Ex. FF, p. 94-96).  The Robertses suggest that this renders his conclusion that the cracking was present since shortly after construction flawed and not credible.  However, given the contrary opinion espoused by Mr. Grandpré that the cracking did not occur until the chemical reaction progressed over years, there is at the least an issue of fact as to whether cracking existed shortly after construction. (*See* Ex. I, p. 52-53).

opinions, but by offering evidence concerning other homes affected by the same condition. Liberty Mutual points to Mr. Grandpré's analysis of these other homes in an attempt to create some sort of standard timeline of progression – which they contend puts the loss outside of its coverage period.  This position is contrary to Mr. Grandpré's opinion in this matter whereby he has stated he would not expect each home to deteriorate or decay at the same rate and that he has "observed a variety of severities from one house to another and from one wall in a house to another wall in a house."  (Ex. I, p. 49-50).  Mr. Grandpré further testified that each home has "its own unique characteristics."  (Ex. I, p. 50).  The notion that Mr. Grandpré has defined a set rate of progression in all cases is false.  Particularly telling is the fact that Liberty Mutual cites to Mr. Grandpré's analysis in a related matter while ignoring his testimony in this matter whereby substantial impairment would have occurred by 2008 – during the period of Liberty Mutual coverage.[12]  (Ex. I, p. 51-52).  In any event, the evidence on summary judgment does not indicate the presence of cracking until the year 2012, though an examination of Mr. Grandpré may indicate to a jury that the substantial impairment occurred before that time, the resolution of that issue is not appropriate on summary judgment.  Respectfully, the Robertses suggest that Liberty Mutual has not met its burden for summary judgment on this point.

**VII.   The Robertses Have Asserted a Viable Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Liberty Mutual claims it may lawfully require the insured to inform the insurer of their theory of coverage as some prerequisite to payment of a claim.  First and foremost, the notion that an insured has to explain coverage to the insurer is absurd.  Such an analysis of policy

---

[12] The deposition passage cited by Liberty Mutual for the proposition that the substantial impairment occurred between the year 2000 and 2004 involved an analysis of two home, neither of which was the Robertses.  (Ex. M, 100-103).  The only discussion relevant to the Robertses home in that passage involves what Mr. Grandpré means by the term "early 2000s."  (Ex. M, p. 100, l. 18-21).

language and facts are well beyond the purview of the average lay insured.  Further, there is no contract language requiring such a level of information from the insureds.  Rather, it is the insurer who is under a statutory duty to investigate claims fully based on all available information.  Conn. Gen. Stat. 38a-816(6)(d).  Here, there is ample factual support for the assertion that Liberty Mutual did not fully and fairly investigate the Robertses' claim.

It is a settled point of law that every contract carries an implied duty requiring that neither party do anything to injure the right of the other party to receive the benefits of the agreement. *Renaissance Management Company, Inc. v. Connecticut Housing Finance Authority,* 281 Conn. 227, 240 (2007).  This "covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term."  *Id.*  In order to constitute a breach of the covenant of good faith and fair dealing, "the acts by which a defendant allegedly impedes the rights of a plaintiff to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 434 (2004).

Bad faith generally implies "actual or constructive fraud, or a design to mislead or deceive another, *or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties...*"  *Id.* (emphasis added).  However, bad faith in the context of insurance may arise where an insurer has acted "unreasonably or contrary to the policy provisions, or that plaintiffs could reasonably expect to receive approval of their claim."  *Craig v. Colonial Penn Ins. Co.,* 335 F. Supp. 2d 296, 306 (D. Conn. 2004).

Though Liberty Mutual professes ignorance of the condition affecting the Robertses' home,[13] it has encountered the very same concrete damage in at least two (2) prior instances. *Matthews v. Peerless,* Connecticut Federal District Court Civil Action No. 3:12-cv-01506 (WWE);[14] *Waters v. Liberty Mutual Group, Inc., et al.* Massachusetts Superior Court, Hampden Division, Docket No. 06-131.[15]  Both of these cases predate the Robertses' claim, one by nearly ten (10) years.  Both cases were advanced under the same legal theories and supported by the same factual elements.  By these cases, Liberty Mutual had full and direct knowledge of the JJ Mottes Concrete problem, especially when coupled with the Mr. Roberts' assertion that the concrete walls of his home were "disintegrating."  (Ex. F).  That Liberty Mutual's engineer is not savvy enough to have encountered this problem previously and, thereby, correctly diagnose the issue, does not relieve Liberty Mutual of its duty to utilize all information – including matters within its own corporate memory – in analyzing the Robertses' claim.   In fact, since the inception of litigation it would appear that Liberty Mutual has denied its own engineer the facts necessary to continue in his investigation or reconsider his opinions, by neglecting or refusing to provide him with the report of the plaintiffs' engineer or even the results of the petrographic analysis of concrete core samples conducted by Liberty Mutual.  (Ex. FF, p. 28-31, 35).   The Robertses respectfully suggest that denying the engineer responsible for the opinion underlying Liberty Mutual's coverage decision the facts necessary to provide continued evaluation of the

---

[13] Which assertions are conclusory and not supported by evidence properly considered on a motion for summary judgment.

[14] At the time that Mathewses' claim was considered by Peerless Insurance Company, Peerless was a member of the Liberty Mutual Group.

[15] The Waters matter was subsequently transferred to the Connecticut Superior Court for the Judicial District of Tolland, where the defendant insurer unsuccessfully sought summary judgment on coverage.  *Waters v. Liberty Mut. Group, Inc.,* 2009 WL 4282809 (Conn.Super. 2009).   While it appears that the engineer in that matter may have misdiagnosed the particular chemical reaction at issue, which is reasonable due to the recent evolution in the testing of this concrete, the engineer did determine that the cracking condition was caused by a chemical reaction within the concrete. *Id.* at *2.

claim is indicative not only of Liberty Mutual's practice in responding to these JJ Mottes claims, but also of its bad faith in that regard.

Finally, Liberty Mutual offers a generous analysis of the content of its denial letter to the Robertses,' suggesting that it denied the claim on the basis of faulty materials, but that the additional cited policy exclusions were never applied.  While this certainly begs the question of why Liberty Mutual was citing to policy exclusions it was not applying to the facts of this case, it also highlights the Robertses' – among other Mottes homeowner's – objections with the type of denial letters offered by insurance companies such as Liberty Mutual in response to these claims. It is the insurers' shotgun approach to denial letters, asserting numerous and dubiously relevant policy exclusions, which the Robertses suggest gives rise to an inference that the insurance industry is acting to mislead or otherwise convince its customers that these claims not covered. This information is not conveyed by meaningful analysis of the collapse coverage, but rather, by volume of – to the lay insured – seemingly reasonable policy quotations.  For instance, the Liberty Mutual denial was ostensibly supported by their engineers finding that the walls were improperly constructed – lacking sufficient reinforcing bars.  (Ex. G, p. 2).  Nothing in this report suggests that the damage was caused by freezing or thawing, earth movement, water damage, or weather conditions.  (Ex. H, p. 1-2).  Liberty Mutual argues that it acted reasonably by hiring a professional engineer to inspect the property and offer an opinion, and yet, it cites to policy exclusions not motivated by that engineering opinion.  The Robertses suggest that this, coupled with Liberty Mutual's knowledge of this condition, gives rise to an inference of impropriety.

Therefore, the Robertses respectfully suggest that there is sufficient evidence to suggest

that Liberty Mutual acted in bad faith by failing to cover their claim.  Though a jury may find

that Liberty Mutual acted appropriately, the fact that it had firsthand knowledge of the JJ Mottes

concrete problem and its actions in denying the claim in a manner not wholly consistent with its

investigation, present sufficient evidence to survive summary judgment.

**VIII.** **The Robertses Have Asserted a Viable Claim for Violation of Connecticut's Consumer Protection Statutes.**

The Robertses have alleged that Liberty Mutual has failed to promptly effectuate

settlement of their claim despite the fact that liability has become reasonably clear.  Conn. Gen.

Stat. 38a-816(6)(f).  The Robertses have also alleged that Liberty Mutual failed to make prompt

settlement as a matter of its general business practice.  *Id.; Lees v. Middlesex Ins. Co.,* 229 Conn.

842, 847-849 (1994).  Liberty Mutual's argument against the CUIPA count focuses mainly on its

general business practice, or lack thereof and the Robertses will also focus on that element.

However, there appears from the other arguments addressed in this memorandum of law, that

liability has become reasonably clear or that there are issues of fact with respect to when this

clarity may have occurred.

There is adequate factual support for the fact that Liberty Mutual denied the Robertses' collapse claim as part of its general business practice in handling those claims.  Liberty Mutual has, to date, unfairly denied identical claims for coverage under identical policy language in nine (9) separate matters.[16]  Furthermore, Liberty Mutual belongs to the Liberty Mutual Group and is complicit in the denial of another ten (10) identical claims for coverage under substantially similar policy language.[17]  A sample of denial letters from these nineteen (19) related matters suggests that Liberty Mutual has a practice of conducting similar investigations of claims involving JJ Mottes concrete and denying such claims based upon references to the same inapplicable policy exclusions cited with respect to the Robertses' claim.  (Ex. GG).

Liberty Mutual attempts to skirt the impact of its actions in these other cases by claiming that it did not know of or consider these other claims – along with relevant caselaw in the vein of *Bacewicz* – when making its coverage decision.  However, that is simply not the issue.  CUIPA requires proof of a general business practice, not the conscious consideration of similar claims

---

[16] *See John J. Celentano v. Liberty Mut. Fire Ins. Co., et al.,* Tolland Superior Court Docket No. TTD-CV-15-6009018-S; *Jay A. Constantino, et al. v. Liberty Mut. Fire Ins. Co., et al.,* Tolland Superior Court Docket No. TTD-CV-16-6010670-S; *Raymond G. Gabriel, et al. v. Liberty Mut. Fire Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:14-CV-01435 (SRU); *James M. Jang, et al. v Liberty Mut. Fire Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:15-CV-01243 (JBA); *David Mensher, et al. v. Liberty Mut. Fire Ins. Co.,* 3:15-CV-01007 (WWE); *Stephen A. Metsack, et al. v. Liberty Mut. Fire Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:14-cv-01150 (VLB); *Michael Roberts, et al. v. Liberty Mut. Fire Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:13-cv-00435 (SRU); *David R. Roy v. Liberty Mut. Fire Ins. Co.,* Tolland Superior Court Docket No. TTD-CV-15-6009410-S; *Stephen D. Wojtyna, et al. v. Liberty Mut. Fire Ins. Co., et al,* Tolland Superior Court Docket No. TTD-CV-16-6010342-S.

[17] *See Stephen Belz, et al. v. Peerless Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:13-cv-1315 (JCH); *Richard N. Dino, et al. v. Safeco Ins. Co. of America, et al.,* Tolland Superior Court Docket No. TTD-CV-16-6010428-S; *Jeremy D. Jenkins, et al. v. Liberty Ins. Corp.,* Connecticut Federal District Court Civil Action No. 3:16-cv-00090 (AVC); *Steven Karas, et al. v. Liberty Ins. Corp.,* Connecticut Federal District Court Civil Action No. 3:13-cv-1836 (SRU); *Shawn M. Kowalyshyn, et al. v. Excelsior Ins. Co., et al.,* Connecticut Federal District Court Civil Action No. 3:16-cv-00148 (JAM); *Thomas Matthews, et al. v. Peerless Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:12-cv-01506 (WWE); *Carlo Piacentini, et al. v. Kemper Independence Ins. Co.,* Tolland Superior Court Docket No. TTD-CV-16-6010341-S; *Paul E. Soderburg, et al. v. Peerless Indemnity Ins. Co., et al.,* Tolland Superior Court Docket No. TTD-CV-16-6010893-S; *Kathleen E. Waters, et al. v. Liberty Mut. Group, Inc., et al.,* Massachusetts Superior Court, Hampden Division, Docket No. 06-131; *Michael Willenborg, et al. v. Unitrin Preferred Ins. Co., et al.,* Tolland Superior Court Docket No. TTD-CV-16-6010936-S.

when deciding to deny coverage.  It is clear from Liberty Mutual's actions in denying these collapse claims across the board, that its general business practice is to avoid paying concrete basement wall failure claims without litigation.  Conn. Gen. Stat. 38a-816(6)(f).  While the number of similar cases may be few, when compared to more common claims like fire or ice dams, as this Honorable Court stated in an earlier ruling in a related matter, there is no magic number of cases necessary to make a general business practice.  *Belz v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 167 (D.Conn. 2014).  This Honorable Court found far more important the "degree of similarity between them and the Belzes' case, and the fact that Peerless has an incentive and mechanism to avoid liability under its current policy language."  *Id.*  As a result, the Robertses suggest that there is sufficient evidence with respect to Liberty Mutual's general business practice to survive summary judgment.

## CONCLUSION

For the foregoing reasons, the plaintiffs, Michael Roberts and Annette Roberts, respectfully request that this Honorable Court deny the defendant, Liberty Mutual Fire Insurance Company's, Motion for Summary Judgment.

PLAINTIFFS,
**MICHAEL ROBERTS and**
**ANNETTE ROBERTS**

By: */s/ Jeffrey R. Lindequist, Esq.*
    Jeffrey R. Lindequist, Esq.
    One Monarch Place, Suite 2220
    Springfield, MA 01144
    (413) 736-4101 – *Telephone*
    (413) 736-4582 – *Facsimile*
    jlindequist@mdparkerlaw.com
    Federal Bar #ct29425

## CERTIFICATE OF SERVICE

I hereby certify that on **August 8, 2016**, a copy of foregoing **Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jeffrey R. Lindequist, Esq.*