| | |
|---|---|
| MICHAEL ROBERTS, and<br>ANNETTE ROBERTS,<br>　　　Plaintiffs,<br><br>　　v.<br><br>LIBERTY MUTUAL FIRE<br>INSURANCE CO.,<br>　　　Defendant. | No. 3:13-cv-00435 (SRU) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Michael and Annette Roberts sued their insurer, Liberty Mutual Fire Insurance Co.

("Liberty Mutual"), after Liberty Mutual denied coverage for the deterioration of their concrete

basement walls. The Robertses allege (1) that Liberty Mutual breached its insurance contract

with them by denying coverage; (2) that Liberty Mutual breached the implied covenant of good

faith and fair dealing by baselessly denying coverage; and (3) that Liberty Mutual committed

unfair and deceptive practices proscribed by the Connecticut Unfair Insurance Practices Act

("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA"). Liberty Mutual has

moved for summary judgment, principally arguing that the damage to the walls is excluded from

coverage under the insurance policy. Because I conclude there is a genuine dispute of material

fact with regard to whether the damage to the walls is covered under the policy, I deny Liberty

Mutual's motion for summary judgment with respect to the Robertses' breach of contract claim.

At the same time, because the Robertses have not shown that Liberty Mutual's coverage position

was unreasonable or taken in bad faith, I grant the motion for summary judgment with respect to

the Robertses' claims for breach of the implied covenant of good faith and fair dealing and

violation of CUTPA/CUIPA.

# I.  Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a summary judgment motion, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000); *Aldrich v. Randolph Ctrl. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). "The burden of showing that no genuine factual dispute exists rests upon the moving party." *Carlton v. Mystic Transp.*, 202 F.3d 129, 133 (2d Cir. 2000). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient evidence supporting its position "to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"The trial court's function at this stage is to identify issues to be tried, not decide them," *Graham v. Long Island R.R. Co.*, 230 F.3d 34, 38 (2d Cir. 2000), and so "[o]nly when no reasonable trier of fact could find in favor of the non-moving party should summary judgment be granted." *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000). Summary judgment therefore is improper "[w]hen reasonable persons, applying the proper legal standards, could differ . . . on the basis of the evidence presented." *Sologub*, 202 F.3d at 178. Nevertheless,

> the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson*, 477 U.S. at 247–48.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and in such circumstances, there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). To present a "genuine" issue of material fact and avoid summary judgment, the record must contain contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## II.    Background

I begin with a general overview of the problem of crumbling foundations in northeastern Connecticut, and then turn to the specific background of this case. The description of the broader problem is for informational purposes only, and does not provide grounds upon which I rely in ruling on the motion for summary judgment.

### A.  Concrete deterioration in northeastern Connecticut

The present lawsuit is one of a series of cases in this district in which Connecticut homeowners have brought claims against their insurers related to the deterioration of their concrete basement walls.[1] *See, e.g.*, *Alexander v. Gen. Ins. Co. of Am.*, 3:16-cv-00059 (SRU); *Roberge v. Amica Mut. Ins. Co.*, 3:15-cv-01262 (WWE); *Kim v. State Farm Fire & Cas. Co.*, 3:14-cv-01150 (VLB); *Belz v. Peerless Ins. Co.*, 3:13-cv-01315 (VAB); *Bacewicz v. NGM Ins.*

---

[1] In addition to the federal lawsuits, the state "judicial district of Tolland presently has over forty such cases pending." *See Roy v. Liberty Mut. Fire Ins. Co.*, 2017 Conn. Super. LEXIS 506, at *1 n.1 (Conn. Super. Ct. Feb. 22, 2017).

*Co.*, 3:08-cv-01530 (JCH). The plaintiffs in those cases all allege that their basement walls have failed structurally due to cracking, crumbling, and bulging caused by a chemical reaction within the concrete. *See, e.g.*, *Belz*, Compl., Doc. No. 1, at 3. They assert that the reaction will continue to impair the stability of the basement walls until the walls—and the house that they support— entirely collapse. *See, e.g.*, *Kim*, Compl., Doc. No. 1, at 3. The defendants in the cases all have denied coverage under the insurance policies, and generally dispute that the walls have "collapsed." *See, e.g.*, *Belz*, Answer, Doc. No. 46, at 7; *Kim*, Answer, Doc. No. 45, at 8.

According to news reports,[2] homeowners in northeastern Connecticut began to alert state officials about crumbling basements as early as 2001. *See* Lisa W. Foderaro & Kristin Hussey, *Financial Relief Eludes Connecticut Homeowners with Crumbling Foundations*, N.Y. Times, Nov. 14, 2016, https://www.nytimes.com/2016/11/15/nyregion/financial-relief-eludes-connecticut-homeowners-with-crumbling-foundations.html. The problem apparently came to widespread attention after it was the subject of an investigation by Hartford's NBC affiliate in 2015. *Id.* To date, more than 400 complaints about deteriorating foundations have been submitted to Connecticut's Department of Consumer Protection, and as many as 34,000 homes across dozens of towns ultimately may be affected. *Id.*

In 2016, the State of Connecticut commissioned a scientific report that found the deterioration was "caused, at least in part, by a naturally existing mineral present in the concrete mix used to pour the foundations." Conn. Dep't of Consumer Prot., *Report on Deteriorating Concrete in Residential Foundations* 1 (Dec. 30, 2016) ("DCP Rep."). That mix included stone

---

[2] I make mention of materials outside the record only "to establish that the matters had been publicly asserted," not for the truth of the contents. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

aggregate taken from Becker's Quarry, which was used in concrete by the J.J. Mottes Concrete

Company ("J.J. Mottes") of Stafford Springs between approximately 1983 and 2016. *Id.* at 7.

Becker's Quarry sits in "a vein of rock that contains significant amounts of pyrrhotite" ($Fe_{1-x}S$), a

mineral that the state investigation found to be "a necessary factor in the chemical reaction

leading to the deterioration of the concrete foundations." *Id.* at 8.

      Pyrrhotite is a "highly reactive" mineral that looks similar to pyrite (fool's gold), but

"degrades much more rapidly than pyrite." A. Brian Hawkins, *Engineering Implications of the*

*Oxidation of Pyrite*, *in* A. Brian Hawkins, *Implications of Pyrite Oxidation for Engineering*

*Works* 1, 2–4 (2014). In the presence of oxygen and water, pyrrhotite oxidizes, producing various

forms of rust such as goethite and limonite, as well as sulfuric acid. Kay Wille & Rui Zhong,

*Investigating the Deterioration of Basement Walls Made of Concrete in CT* (2016), App'x D to

DCP Rep., at 52; Josée Duchesne & Benoît Fournier, *Deterioration of Concrete by the Oxidation*

*of Sulphide Materials in the Aggregate*, 7 J. Civil Eng'g & Architecture 922, 930 (2013). The

sulfuric acid then "reacts with the solid of the cement paste" to form "secondary minerals that

cause expansion" such as gypsum, ettringite, and thaumasite. Wille & Zhong, *supra*, at 52;

Duchesne & Fournier, *supra*, at 930. The products of pyrrhotite oxidation "are expansive" and,

according to the state's scientific investigation, "might ultimately lead to the premature

deterioration of the concrete foundation[s]." Wille & Zhong, *supra*, at 52.

  B.  <u>The present litigation</u>

      Sometime in the spring or summer of 2012, Michael and Annette Roberts noticed that a

series of horizontal and vertical cracks had appeared in their basement's concrete walls. *See*

Michael Roberts Depo. (Apr. 14, 2016), Ex. K to Local Rule 56(a)1 Statement, Doc. No. 74-11,

at 24; Annette Roberts Depo. (Apr. 14, 2016), Ex. DD to Mem. Opp'n Mot. Summ. J., Doc. No.

78-4, at 6. When the Robertses consulted a building contractor, Dean Soucy, he told them that "the walls were deteriorating" and needed to be replaced. Michael Roberts Depo., Doc. No. 74-11, at 33; Annette Roberts Depo., Doc. No. 78-4, at 11.

On December 14, 2012, the Robertses reported a claim under their homeowners' insurance policy to Liberty Mutual, which has insured their house since 2007.[3] Local Rule 56(a)1 Statement, Doc. No. 74, at 1–2. Liberty Mutual sent an engineer, Michael Berry, to inspect the house on January 3, 2013. *Id.* at 3. Berry reported that, despite "various deficiencies," the walls "remain[ed] plumb and mostly water resistant," and he concluded that the cracks were caused by a lack of "adequate reinforcing bars" in the concrete. Berry Rep. (Jan. 4, 2013), Ex. G to Local Rule 56(a)1 Statement, Doc. No. 74-7, at 2. Berry suggested the Robertses "careful[ly] monitor[]" the cracks using calibration strips. *Id.* If the cracks grew by more than one-eighth of an inch, he "recommend[ed] foundation repair using carbon fiber wall straps." *Id.*

After Berry's inspection, Liberty Mutual wrote to the Robertses denying their claim on the basis that the cracks were "due to faulty construction" and therefore excluded by the policy. Denial Letter (Jan. 10, 2013), Ex. H to Local Rule 56(a)1 Statement, Doc. No. 74-8, at 1. In

---

[3] Liberty Mutual suggests that it is not liable because the Robertses "did not insure their property with Liberty [Mutual] until . . . 2007," whereas they allege that "a substantial impairment to the structural integrity of their basement walls occurred 'at some point' between 1990 and July of 2012." Mem. Supp. Mot. Summ. J., Doc. No. 73, at 2. For "long-tail" losses such as "gradual contamination," however, Connecticut applies the "continuous trigger theory," which holds that "whenever the claimant was exposed to the cause of the injury, was injured in fact, or the injury became manifest, . . . any of th[o]se events trigger the applicable insurance policy in force at the time of the event." *See Travelers Cas. & Sur. Co. of Am. v. Neth. Ins. Co.*, 312 Conn. 714, 753 n.32 (2012); *R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co.*, 171 Conn. App. 61, 118 (2017); *United Techs. Corp. v. Am. Home Assurance Co.*, 989 F. Supp. 128, 152–53 (D. Conn. 1997). Here, the concrete deterioration "became manifest" in 2012, within the period of Liberty Mutual's coverage. *See Neth. Ins. Co.*, 312 Conn. at 753 n.32.

Coverage A, the policy provides that Liberty Mutual "insure[s] against risk of direct [physical] loss to property," but adds that Liberty Mutual "do[es] not insure" for loss:

> 1. Involving collapse, other than as provided in Additional Coverage 8;
>
> 2. Caused by: . . .
>
>> e. Any of the following:
>>
>>> (1) Wear and tear, marring, deterioration;
>>>
>>> (2) Inherent vice, latent defect, mechanical breakdown;
>>>
>>> (3) Smog, rust or other corrosion, mold, wet or dry rot; . . . [or]
>>>
>>> (6) Settling, shrinking, bulging or expansion, including resultant cracking of pavements, patios, foundations, walls, floors, roofs, or ceilings . . . .

Liberty Pol'y, Ex. A to Local Rule 56(a)1 Statement, Doc. No. 74-1, at 12. In addition, under "Exclusions," Liberty Mutual provides that it also "do[es] not insure for loss" caused by:

> c. Faulty, inadequate, or defective: . . .
>
>> (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; [or]
>>
>> (3) Materials used in repair, construction, renovation, or remodeling . . . .

*Id.* at 14. For both of the above sections, "any ensuing loss to property . . . not excluded or excepted in th[e] policy is covered." *Id.* at 12, 14.

In Additional Coverage 8, the policy further provides that Liberty Mutual "insure[s] for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of":

> b. Hidden decay; . . .
>
> f. Use of defective material or methods in construction, remodeling or renovation.
>
> Loss to a[] . . . foundation, [or] retaining wall, . . . is not included under items b. . . . and f. unless the loss is a direct result of the collapse of a building.

7

Collapse does not include settling, cracking, shrinking, bulging, or expansion.

*Id.* at 11, 29. Liberty Mutual cited Coverage A and the Exclusions in its coverage denial letter, but not the Additional Coverage for Collapse. *See* Denial Letter, Doc. No. 74-8, at 1–2.

The Robertses claim that the loss to their basement walls is covered as a "collapse." *See* Compl., Doc. No. 1, at 4. They argue that the cracks are caused by pyrrhotite oxidation; that "[t]here is no known scientific or engineering method or process which is effective in reversing the deterioration"; and that "[i]t is only a question of time until the basement walls of the Roberts[es]' home will fall in due to the exterior pressure from the surrounding soil." *Id.* at 3. As a result, they assert that "the basement walls [have] suffered a substantial impairment to their structural integrity," bringing them within the meaning of "collapse" when undefined in an insurance policy under Connecticut law. *Id.*

The Robertses initiated the present lawsuit against Liberty Mutual on April 2, 2013. Compl., Doc. No. 1, at 1. They alleged that Liberty Mutual breached the insurance contract by denying coverage notwithstanding the Additional Coverage for Collapse. *Id.* at 4. They also claimed that Liberty Mutual's conduct breached the implied covenant of good faith and fair dealing, and violated CUTPA/CUIPA. *Id.* at 5, 7, 10.

Liberty Mutual moved to dismiss on July 1, 2013, Doc. No. 13, and I denied the motion on December 16, 2013. Doc. No. 25. The parties then engaged in discovery, after which Liberty Mutual moved for summary judgment on June 16, 2016. Doc. No. 72. The Robertses opposed the motion on October 8, 2016, Doc. No. 78, and a number of insurers within the Travelers group filed an amicus brief on November 7, 2016. Doc. No. 86. I held a hearing on November 10, 2016, and took Liberty Mutual's motion under advisement.[4] Doc. No. 88.

---

[4] I also requested that the parties and amicus provide supplemental briefing on whether I should certify questions of state law to the Connecticut Supreme Court. The parties and amicus filed

## III.    Discussion

Liberty Mutual has moved for summary judgment on the grounds that (i) "the [p]olicy does not provide coverage for the plaintiffs' claim," (ii) Liberty Mutual "evaluated and denied the plaintiffs' claim on its own merits," and (iii) the Robertses' "allegations of a general business practice of denying 'concrete decay' claims and [Liberty Mutual's] participation in an insurance industry-wide conspiracy regarding its denial of their claim have no factual basis." Mem. Supp. Mot. Summ. J., Doc. No. 73, at 8. Liberty Mutual's first basis for summary judgment responds to the Robertses' breach of contract claim; the second, to the breach of the implied covenant of good faith and fair dealing claim; and the third, to the CUTPA/CUIPA claim.

The insured bears the burden of showing that a loss is covered under an insurance policy, but "the insurer bears the burden of showing that an exclusion applies to exempt it from covering a claim." *MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011) (applying Connecticut law). If there are no genuine issues of material fact, then the question whether coverage exists "is appropriately decided on a motion for summary judgment." *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 445 (D. Conn. 2010).

Under Connecticut law, "construction of a contract of insurance presents a question of law for the court." *Lexington Ins. Co. v. Lexington Healthcare Grp.*, 311 Conn. 29, 37 (2014). "The determinative question is the intent of the parties, that is, what coverage the . . . insured expected to receive and what the insurer was to provide, as disclosed by the provisions of the

---

their respective briefs on December 5, 2016. *See* Docs. 91–93. I ultimately concluded that there were "several Connecticut state court cases . . . applicable to the legal question[s] raised," and that "sufficient precedents exist[ed] for me to make a prediction of how the [Connecticut Supreme Court] would decide the question." *See Goodlett v. Kalishek*, 223 F.3d 32, 37 n.4 (2d Cir. 2000); *Karagozian v. Luxottica N. Am.*, 2016 WL 2944149, at *4 (D. Conn. May 20, 2016). Therefore, I did not certify questions to the state's highest court.

policy." *Conn. Ins. Guar. Ass'n v. Drown*, 314 Conn. 161, 187–88 (2014) (internal brackets omitted). In construing the policy, I must give its words "their natural and ordinary meaning," often by "look[ing] to the dictionary definition of the term." *Lexington Healthcare Grp.*, 311 Conn. at 42 n.8. When the contract's terms "are, without violence, susceptible of two equally reasonable interpretations," however, "that which will sustain the claim and cover the loss must, in preference, be adopted." *Id.* at 188 (internal brackets omitted). In other words, "because the insurance company drafted the policy," any ambiguity is "resolved in favor of the insured." *Lexington Healthcare Grp.*, 311 Conn. at 38; *Drown*, 314 Conn. at 188. Therefore, I must construe ambiguous language "in accordance with the reasonable expectations of the insured when he [or she] entered into the contract." *Drown*, 314 Conn. at 188; *Travelers Cas. & Sur. Co. v. Neth. Ins. Co.*, 312 Conn. 714, 740 (2014).

"[W]hether an insurance policy is ambiguous is a matter of law for the court to decide." *Travelers Cas. & Sur. Co. v. Neth. Ins. Co.*, 312 Conn. 714, 740 (2014). "Context is often central to the way in which policy language is applied," and "the same language may be found both ambiguous and unambiguous as applied to different facts." *Lexington Healthcare Grp.*, 311 Conn. at 41–42. Hence, the language of an insurance policy "must be construed in the circumstances of a particular case, and *cannot be found to be ambiguous or unambiguous in the abstract.*" *Id.* at 42 (internal quotation marks omitted). The mere fact that the parties "advance different interpretations" of phrases in a policy "does not necessitate a conclusion that the language is ambiguous." *Drown*, 314 Conn. at 188. But where each party "has a reasonable but different interpretation of the phrases supported by dictionaries and case law," that indicates that "the phrases are ambiguous" and "must be construed against the insurer." *Karas v. Liberty Ins.*

*Corp.*, 33 F. Supp. 3d 110, 115 (D. Conn. 2014); *EDO Corp. v. Newark Ins. Co.*, 878 F. Supp. 366, 372 (D. Conn. 1995).

A. Count I: Breach of contract

As an initial matter, the parties contest whether the policy covers the alleged damage at all. Liberty Mutual contends that the damage to the basement walls is excluded under provisions that deny coverage for loss "[c]aused by . . . [w]ear and tear, marring, [or] deterioration, . . . [i]nherent vice, latent defect, [or] mechanical breakdown, . . . [or] [s]ettling, shrinking, bulging or expansion, including resultant cracking, of . . . foundations [or] walls." Liberty Pol'y, Doc. No. 74-1, at 12; *see* Mem. Supp. Mot. Summ. J., Doc. No. 73, at 10. Nor is the damage covered as a "collapse," Liberty Mutual argues, because "the 'collapse' provision excludes coverage for loss to a foundation or retaining wall unless the loss is a direct result of the collapse of the building." Mem. Supp. Mot. Summ. J., Doc. No. 73, at 10 (discussing Liberty Pol'y, Doc. No. 74-1, at 11). That provision also provides that "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion." Liberty Pol'y, Doc. No. 74-1, at 11.

The Robertses respond that the terms "foundation" and "retaining wall" are ambiguous, and that the basement walls are covered as part of the building. Mem. Opp'n Mot. Summ. J., Doc. No. 78, at 9, 16. Because the walls have been "substantially structurally impaired"—and the policy does not define "collapse"—the walls have "collapsed" under Connecticut law. *Id.* at 6–8 (citing *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987)). The Robertses thus assert that a reasonable jury could find that coverage exists under the policy. *Id.* at 4.

1. *Is there a "genuine dispute" with regard to whether the Robertses' basement walls have "collapsed"?*

Although Liberty Mutual focuses on the "foundation or retaining wall" exclusion, the Robertses sensibly argue that the logically prior question is "whether the insured building or any part of the insured building has 'collapsed.'" *Id.* at 6. If the basement walls are not in a state of "collapse," then I need not decide if any collapse would be excluded as part of a "retaining wall" or "foundation." Hence, I begin with whether the Robertses' walls have collapsed. First, I must consider the meaning of "collapse" in the insurance policy. Then, I must decide whether a reasonable jury could find that the damage to the walls falls within the definition of "collapse."

a. How is "collapse" defined?

The Robertses' insurance policy does not define the term "collapse." In *Beach v. Middlesex Mutual Assurance Co.*, 205 Conn. 246 (1987), the Connecticut Supreme Court held that the term "collapse" in a homeowners' insurance policy, when otherwise undefined, was "sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building." *Id.* at 252. The *Beach* Court specifically rejected the insurer's contention that "'collapse' . . . unambiguously contemplates a sudden and complete falling in of a structure," but did not further define the standard of "substantial impairment of [] structural integrity." *Id.* at 250, 252. The parties here dispute whether the Robertses' basement walls have suffered a "substantial impairment" that constitutes a "collapse." *See id.* at 252.

To clarify the meaning of "substantial impairment of [] structural integrity," I first consider the origins of "collapse" coverage. As a recent Eighth Circuit opinion explained, "[h]istorically, fire insurance policies provided that coverage was extinguished by a building's collapse. With the advent of all-risk policies, insurers began adding specific provisions excluding collapse losses and then, in some policies, covering some or all such losses by special

12

endorsement." *KAAPA Ethanol v. Affiliated FM Ins. Co.*, 660 F.3d 299, 303 (8th Cir. 2011).

Yet—as the Second Circuit observed as long ago as 1977—"the expression 'collapse of

buildings or any part thereof[,]' in terms of insurance coverage, is a coat of varied colors," and

"[t]he question of what constitutes a collapse is largely one of degree." *See Bailey v. Hartford*

*Fire Ins. Co.*, 565 F.2d 826, 830 (2d Cir. 1977). As a result, ever since policies began including

"collapse" provisions, "courts have disagreed whether the collapse of a structure requires proof

of a 'falling in . . . loss of shape, [or] reduction to flattened form or rubble' (the 'rubble-on-the-

ground' standard), or only proof of damage that materially impaired the structure's 'substantial

integrity' (the 'material-impairment' standard)." *KAAPA Ethanol*, 660 F.3d at 305 (comparing

*Century Mutual Insurance Co. v. Royal*, 269 Ala. 372 (1959), with *Jenkins v. U.S. Fire*

*Insurance Co.*, 185 Kan. 665 (1959)).

    In *Beach*, Connecticut adopted the material-impairment standard, which "has . . . become

the majority view." *See id.* Courts favoring the material-impairment standard have reasoned that

the term "collapse" is, at the very least, ambiguous, and may reasonably be read to mean either

"a catastrophic breakdown" or merely "a breakdown or loss of structural strength."[5] *Beach*, 205

Conn. at 251. "Because it is the insurance company that has drafted the terms of the insurance

---

[5] In fact, both readings have sound etymological bases. The verb "collapse" first "appeared in the English language . . . [i]n 1755," as an entry in Samuel Johnson's *Dictionary. See GEICO v. DeJames*, 256 Md. 717, 722 (1970). "Collapse" did not "appear[] as a noun [until] the first part of the nineteenth century," and until the late nineteenth century, the noun "was found principally in the vocabulary of physiology and medicine." *See id.* Whereas the verb "collapse" has been defined as "to break down completely" or "to cave in," the noun has "a somewhat different connotation: 'a breakdown . . . in strength'" or "giving way, etc., through external pressure or loss of rigidity or support." *Id.* at 721–23 (comparing definitions in *Webster's Third International Dictionary* (1941) to those in the *Oxford English Dictionary* (1933)). Insurers, by arguing (for example) that a wall that "merely cracked and bulged" has not "collapse[d], . . . would have [courts] apply to the noun the more restrictive connotation usually ascribed to the verb. Th[at] is the root of the ambiguity . . . ." *See id.* at 723.

policy, any ambiguity contained therein is traditionally construed against the insurer and in favor of insurance coverage." *S & S Tobacco & Candy Co. v. Greater N.Y. Mut. Ins. Co.*, 224 Conn. 313, 320 (1992). Hence, courts have concluded that "if the [insurer] intended that the word 'collapse' should be ascribed the abstract dictionary definition" of catastrophic breakdown, "it should have so stated." *See Travelers Fire Ins. Co. v. Whaley*, 272 F.2d 288, 290–91 (10th Cir. 1959). Having failed to do so, the insurer cannot complain when courts treat "the term 'collapse' . . . [as] ambiguous" and "construe[] [it] in favor of the insured." *See Ercolani v. Excelsior Ins. Co.*, 830 F.2d 31, 34 (3d Cir. 1987) (discussing *Whaley*).

But even among states that have adopted the material-impairment standard, courts further divide with regard to the definition of "substantial impairment." "[S]ome courts applying the [material impairment] standard . . . have ruled that a structure must be in 'imminent danger' of falling to the ground, or must be abandoned or taken out of service, before a material impairment will constitute a collapse." *See KAAPA Ethanol*, 660 F.3d at 305. "Imminent," in that context, "means collapse is 'likely to happen without delay; impending or threatening,' and requires a showing of more than substantial impairment." *Id.* at 306 (quoting *Ocean Winds Council of Co-Owners v. Auto-Owner Ins. Co.*, 350 S.C. 268 (2002)). "Courts have required proof of imminence because that requirement . . . 'avoids both the absurdity of requiring an insured to wait for a seriously damaged building to fall and the improper extension of coverage' that would convert the policy 'into a maintenance agreement.'" *Id.* (quoting *Doheny W. Homeowners' Ass'n v. Am. Guar. & Liab. Ins. Co.*, 60 Cal. App. 4th 400 (1997)). Abandonment, in turn, has been treated as "relevant to whether a 'collapse' occurred," but fewer courts have deemed it "necessary or essential to a finding of collapse that a structure be taken out of service or rendered uninhabitable." *See id.* at 307.

In the present case, Liberty Mutual favors a construction of "collapse" that incorporates "some sort of imminence requirement." *Cf. KAAPA Ethanol*, 660 F.3d at 306. It points for support to *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Casualty Co.*, 183 Wash. 2d 485 (2015) ("*Queen Anne*"), in which the Washington Supreme Court (on certification from the Ninth Circuit) held that "'substantial impairment' of 'structural integrity' means an impairment so severe as to materially impair a building's ability to remain upright"—that is, an impairment "that renders all or part of the building unfit for its function or unsafe." *See id.* at 492. Several other courts have treated "substantial impairment" in a similar manner.[6] *See, e.g.*, *Campbell v. Norfolk & Dedham Mut. Fire Ins. Co.*, 682 A.2d 933, 936 (R.I. 1996) (per curiam) (loss of portion of basement wall was a "collapse" because it "eventually render[ed] th[e] home uninhabitable"); *DeJames*, 256 Md. at 721 (engineer testified that basement wall was "unsafe," that "its condition was beyond any reasonable use," and that "it could 'no longer usefully sustain a load'"); *Rogers v. Md. Cas. Co.*, 252 Iowa 1096, 1099 (1961) (evidence showed "bulging and buckling of the basement walls" rendered the house's "basic structure . . . materially impaired," and that "it was dangerous to occupy it").

Connecticut state and federal courts, however, consistently have declined to follow the reasoning of *Queen Anne* and like cases. *See, e.g.*, *Metsack v. Liberty Mut. Fire Ins. Co.*, 2017 WL 706599, at *6 (D. Conn. Feb. 21, 2017) (Bryant, J.); *Belz v. Peerless Ins. Co.*, 204 F. Supp. 3d 457, 464 (D. Conn. 2016) (Bolden, J.); *Roy v. Liberty Mut. Fire Ins. Co.*, 2017 Conn. Super. LEXIS 506, at *14–*17 (Conn. Super. Ct. Feb. 22, 2017) (Cobb, J.). My colleague, U.S. District Judge Vanessa L. Bryant recently observed that *Queen Anne*'s requirement that a "'substantial

---

[6] Although the decisions of "courts in other jurisdictions . . . [are] not binding" on me or the Connecticut state courts, I may consider them to the extent that I regard them as "persuasive." *See New London Cnty. Mut. Ins. Co. v. Zachem*, 145 Conn. App. 160, 166–67 (2013).

impairment . . . materially impair a building's ability to remain upright'" conflicts with *Beach*'s holding that "a collapse could occur 'even though no actual caving-in occurred and the structure was not rendered completely uninhabitable.'" *Metsack*, 2017 WL 706599, at *6 (quoting *Queen Anne*, 183 Wn. 2d at 492; *Beach*, 205 Conn. at 252). So too, Judge Susan Quinn Cobb of the Connecticut Superior Court observed that *Queen Anne*'s requirements appear "different, and more limited, than our Supreme Court's broader definition of collapse set forth in *Beach*." *Roy*, 2017 Conn. Super. LEXIS 506, at *16. Whereas "*Queen Anne* requires that the building be unfit for its function and unsafe," *Beach*'s "definition of 'collapse' . . . includes '*any* substantial impairment of the structural integrity of the building,'" and "does not require that the home be uninhabitable." *Id.* at *15–*16 (quoting *Beach*, 205 Conn. at 252) (emphasis in *Roy*).

The facts in *Beach* also indicate that the *Queen Anne* standard is inapposite. The Beaches' "house never actually caved in," and "the plaintiffs continued in occupancy during the period . . . [of] needed structural repairs." *Beach*, 205 Conn. at 248; *accord Rogers*, 252 Iowa at 1099 ("[T]he[] walls had not completely fallen down."). "Despite the nonoccurrence of a sudden catastrophe," however, "the trial referee heard and found credible the testimony of a number of witnesses that the house *would have caved in had the plaintiffs not acted to repair the damage*." *Beach*, 205 Conn. at 248–49 (emphasis added); *accord DeJames*, 256 Md. at 721 ("While it is quite apparent that but for the wooden supports, the wall might have fallen in, it did not."); *Rogers*, 252 Iowa at 1099 ("[T]he entire north basement wall was in danger of falling in."). The trial judge added that "the foundation failed structurally, and [its] function . . . had become materially impaired, constituting a collapse." 205 Conn. at 249. On appeal, the *Beach* court affirmed the lower court's "f[inding], as a matter of fact, that the plaintiffs had proven [substantial] impairment of their house." *See id.* at 253.

I interpret *Beach* to require that a "collapse"—in the form of "substantial impairment of [] structural integrity"—be proved by evidence that a building "would have caved in had the plaintiffs not acted to repair the damage." *See id.* at 249. That standard comports with the reasoning of the cases on which *Beach* relied, which held that collapse was proven where "but for . . . wooden supports, the wall might have fallen in, [but] it did not," or where the "basement wall was in danger of falling in." *DeJames*, 256 Md. at 721; *Rogers*, 252 Iowa at 1099; *see Beach*, 205 Conn. at 252 (citing *De James* and *Rogers*). It also "achieves an appropriate middle ground that avoids either eviscerating catastrophic coverage of collapse, or effectively nullifying the faulty workmanship and settling exclusions." *See KAAPA Ethanol*, 660 F.3d at 306. Insurers will not escape paying for "catastrophic collapse[s]" simply because insureds mitigate their losses by conducting emergency repairs, but at the same time, they also will "not . . . [become] liable for run-of-the-mill basement wall leakage and shifting problems." *Hawes v. Germantown Mut. Ins. Co.*, 103 Wis. 2d 524, 543 (1981).

Of course, the requirement that a building "would have caved in" should not be interpreted so strictly as to eviscerate the material-impairment standard. In *Beach*, the plaintiffs "continued in occupancy during . . . repairs," and "the house never actually caved in." *See* 205 Conn. at 248; *accord De James*, 256 Md. at 721; *Rogers*, 252 Iowa at 1099. In contrast to *Queen Anne*, at the time of the repairs in *Beach*, the impairment may not yet have been "so severe as to materially impair [the] building's ability to remain upright." *Cf. Queen Anne*, 183 Wash. 2d. at 492. Yet the Connecticut Supreme Court indicated it was sufficient that "*eventually* the house would have fallen into the cellar."[7] *See Beach*, 205 Conn. at 249 (emphasis added); *accord*

---

[7] To require that the plaintiffs wait for the house to be in immediate danger of collapse also would conflict with *Beach*'s policy rationale. The Connecticut Supreme Court noted that "[r]equiring the insured to await an actual collapse would not only be economically wasteful, but

*Campbell*, 682 A.2d at 936 ("collapse" covers loss of a portion of a "basement wall that *eventually* renders th[e] home uninhabitable" (emphasis added)).

My reading of *Beach* also aligns with a Second Circuit decision addressing similar issues under New York law. In *Dalton v. Harleysville Worcester Mutual Insurance Co.*, 557 F.3d 88 (2d Cir. 2009), the Second Circuit considered a nearly identical insurance policy in the context of the state courts' conflicting definitions of "collapse." The plaintiffs in that case owned a building that was "so severely damaged by hidden decay that the New York City Department of Buildings issued a notice to vacate." *See id.* at 89. After their insurer denied their claim, the plaintiffs sued for breach of the policy, alleging that the building had "collapse[d]" as a result of "hidden decay." *See id.* (other alterations omitted). The district court granted summary judgment for the insurer, "holding that the damage to the [plaintiffs]' building came within the policy's express exclusion of 'bulging,' and in any event did not come within the concept of 'collapse' under New York law, which . . . [was] triggered only by 'total or near total destruction.'" *See id.* at 89.

The Second Circuit reversed. As an initial matter, it held that the district court had misread the plaintiffs' expert report as referring to "'bulging' as the defect constituting the collapse," when the report also "observed 'crumbling and deteriorated [mortar joints]' that led to "structural failure." *See id.* at 91. More importantly, the Second Circuit held that the district court erred in construing collapse only to "appl[y] . . . to total or near total destruction of the property," and to exclude damage that rendered a building "merely structurally unsound." *See id.* at 90. No decisions of the New York Court of Appeals were squarely on point, but two Appellate Division opinions contradictorily defined "collapse" to mean "total or near destruction," in one case, and

_____

would also conflict with the insured's contractual and common law duty to mitigate damages." *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 253 n.2 (1987).

"substantial impairment of [] structural integrity," in another. *See id.* at 91 (comparing *Graffeo v. U.S. Fidelity & Guaranty Co.*, 20 A.D.2d 643 (2d Dep't 1964) with *Royal Indem. Co. v. Grunberg*, 155 A.D.2d 187 (3d Dep't 1990)). Because "[t]he state of the law in New York with respect to the meaning of the term 'collapse' . . . [was] a conflict of Appellate Division rulings," the Second Circuit concluded that the "policy . . . [was] ambigu[ous]" and must be construed "in favor of the insured." *See id.* at 92–93 (internal quotation marks omitted). The court "therefore reject[ed] the district court's ruling that . . . coverage for collapse cover[ed] only a total or near-total destruction and not a substantial impairment of the integrity of the building." *Id.*

The insurer in *Dalton* urged that "New York law require[d] . . . that the condition [of collapse] arise suddenly." *See id.* at 92. The Second Circuit disagreed. "The policy at issue expressly provide[d] coverage for collapse caused by 'hidden decay' and 'hidden insect or vermin damage,'" the Second Circuit reasoned. *Id.* at 93. "By their very nature, hidden decay and hidden insect or vermin damage occur slowly and not as a sudden destructive force." *Id.* Thus, even if New York state court decisions "should be read to mean that the term 'collapse,' without further explanation, require[d] a sudden destructive force," the Second Circuit held "that [was] surely not the case where the policy in question define[d] collapse in a manner which expressly include[d] conditions that occur only slowly." *Id.* Notably, the Robertses' policy here contains identical coverage for "collapse of a building or any part of a building caused . . . by . . . [h]idden decay [or] [h]idden insect or vermin damage." *See* Liberty Pol'y, Doc. No. 74-1, at 11. And Connecticut courts, unlike those in New York, explicitly disavow any implication that "the term 'collapse,' without further explanation, requires a sudden destructive force." *See Dalton*, 577 F.3d at 92; *cf. Beach*, 205 Conn. at 252.

Although *Dalton* was not a decision of a Connecticut court, the insurance policy in *Dalton* appears identical in all relevant respects to the insurance policy in the present case, and the Connecticut Supreme Court has stated that such a policy "does not unambiguously limit [the insurer's] liability to a 'collapse' of a sudden and catastrophic nature." *See Beach*, 205 Conn. at 252. Therefore, following *Dalton* and *Beach*, I hold that—in the absence of a contrary policy definition[8]—a building has "collapsed" by suffering a "substantial impairment of [] structural integrity" if it "would have caved in had the plaintiffs not acted to repair the damage." *See Beach*, 205 Conn. at 249. Evidence that a building was "unfit for its function or unsafe" would, of course, be highly probative that the structure "would have caved in had the plaintiffs not acted to repair the damage." *Cf. Queen Anne*, 183 Wash. 2d. at 492; *Beach*, 205 Conn. at 249. But the latter could perhaps also be shown by evidence that a portion of the building "eventually [would be] render[ed] . . . uninhabitable" or "was in danger of falling in," even if it was not at that very moment "unfit for its function." *Compare Campbell*, 682 A.2d at 936, *and Rogers*, 252 Iowa at 1099, *with Queen Anne*, 183 Wash. 2d at 492.

>    b.   Could a reasonable jury find that the Robertses basement walls have suffered a "substantial impairment of [] structural integrity"?

Under *Beach*, whether a building has suffered a "substantial impairment of [] structural integrity" is "a question . . . of fact, not one of law." *Metsack*, 2017 WL 706599, at *6

---

[8] The insurer can always "limit its risk to actual and complete collapse to the ground" by including narrower definitions in the policy. *401 Fourth Street v. Investors Ins. Co.*, 823 A.2d 177, 179 (Pa. Super. Ct. 2003). The Connecticut Supreme Court in *Beach* specifically "invited . . . insurance compan[ies] to define the term 'collapse,'" and some have done so. *See Jermiola v. Hartford Cas. Ins. Co.*, 2017 WL 1258778, at *8 (Conn. Super. Ct. Mar. 2, 2017) (discussing *Beach*, 205 Conn. at 251). Where the insurer has chosen to remain subject to "the more liberal common law definition of 'collapse,'" however, *see id.*, "it is not the trial court's responsibility to rewrite the policy to protect the insurer." *401 Fourth Street*, 823 A.2d at 179. "Particularly with this much warning, the insurer is capable of unambiguously limiting collapse coverage if it wishes to do so." *Schray v. Fireman's Fund Ins. Co.*, 402 F. Supp. 2d 1212, 1218 (D. Or. 2005).

(discussing *Beach*, 205 Conn. at 253); *see also Belz*, 204 F. Supp. 3d at 464 (Because "there is a material dispute as to whether the damage amounts to a 'collapse' . . ., the question of whether the damage was covered under the 'collapse' provisions of the insurance policy cannot appropriately be resolved at the summary judgment stage and should be left for the jury."); *Roy*, 2017 Conn. Super. LEXIS 506, at *17–*18 ("[W]hether there has been 'any substantial impairment of the structural integrity' of the plaintiff's home . . . is an issue of disputed fact, about which the parties' experts disagree. Because this issue involves a genuine issue of material fact, it must be decided by the jury."); *accord Chafin ex rel. Estate of Bradley v. Farmers & Mechanics Mut. Ins. Co. of W. Va.*, 232 W. Va. 245, 252 (2013) (per curiam) (holding that whether "substantial impairment of [] structural integrity" occurred "is a genuine issue of material fact that must be decided by a jury"). In other words, the "definition of collapse annunciated in *Beach* . . . render[s] the issue one for the jury to decide." *See Jermiola v. Hartford Cas. Ins. Co.*, 2017 WL 1258778, at *7 (Conn. Super. Ct. Mar. 2, 2017). Hence, I may grant Liberty Mutual's motion for summary judgment on the issue of "collapse" only if "no reasonable trier of fact could find in favor" of the Robertses. *See White*, 221 F.3d at 300.

As evidence of "substantial impairment," the Robertses have offered a report by their engineering expert, David Grandpré, in which he opined that "the concrete basement walls were substantially impaired" because "[t]he cracking and bulging of the walls suggests that portions of the concrete basement walls had structurally failed." Grandpré Rep. (June 6, 2014), Ex. BB to Mem. Opp'n Mot. Summ. J., Doc. No. 78-2, at 4–5. In Grandpré's view, "the severity of deterioration of the concrete basement walls had compromised the structural integrity and advanced to a point where the concrete basement walls would no longer be competent to perform their intended function of supporting the weight of the floors, walls, and roof." *Id.* at 5. At his

deposition, Grandpré further stated that "th[e] bad aggregate . . . [will] eventually get worse, . . . to a point it's unsafe to live in the house," and that "th[e] concrete is doomed to fail." *See* Grandpré Depo. (Aug. 5, 2014), Ex. I to Local Rule 56(a)1 Statement, Doc. No. 74-9, at 13. Grandpré concluded that "the only viable . . . action is to remove the deteriorated concrete basement walls and replace them."[9] Grandpré Rep., Doc. No. 78-2, at 5.

Conversely, Liberty Mutual's engineering expert, Michael J. Berry, examined the Robertses' walls and concluded that "[d]espite cracks and missing anchor bolts, the foundation walls remain plumb and mostly water resistant." Berry Rep., Doc. No. 74-7, at 2. Berry believed that the cracks occurred because "[t]he foundation wall was constructed without adequate reinforcing bars," and that the "[c]racks initiated when the excavation backfill was placed against the exterior of the foundation wall prior to construction of the first floor framing and diaphragm." *Id.* Liberty Mutual's petrographic expert, Nick Scaglione, conceded that the concrete's "moderate to severe . . . cracking distress" was "due to the oxidation of iron sulfide minerals (i.e., primarily pyrrhotite $Fe_{1-x}S$) present within the aggregate particles," but he disputed that the deterioration could not be stopped. Scaglione Rep. (Jan. 6, 2015), Ex. L to Local Rule 56(a)1 Statement, Doc. No. 74-12, at 6–7. Scaglione opined that "for the cracking distress to have reached the observed levels, a long term exposure to an exterior source of water is necessary." *Id.* at 8. "Although it is not possible to reverse the deterioration of distress related to the oxidation of iron sulfide minerals," he concluded, "the distress can be arrested by cutting off the source of exterior water to the concrete." *Id.* at 9.

---

[9] The Robertses' building contractor, Dean Soucy—who has seen "[p]robably at least 100" basements with the same problem—also stated that he was "not aware of anything that [had] been successful in arresting the process," and that he "ha[d]n't seen a job yet that anybody [was] able to [repair]." Soucy Depo. (Aug. 5, 2014), Ex. O to Local Rule 56(a)1 Statement, Doc. No. 74-15, at 15, 26.

In short, "the parties' experts disagree" with regard to the cause, severity, and redressability of the damage to the Robertses' basement walls. *Cf. Roy*, 2017 Conn. Super. LEXIS 506, at *17. The Robertses have introduced evidence that would permit a jury to find that their basement walls are irreversibly deteriorating to the point that they have "structurally failed," Grandpré Rep., Doc. No. 78-2, at 4–5, bringing the damage within an ordinary layperson's understanding of the term "collapse." *See* Kristin Hussey & Lisa W. Foderaro, *With Connecticut Foundations Crumbling, 'Your Home Is Now Worthless,'* N.Y. Times, June 7, 2016, https://www.nytimes.com /2016/06/08/nyregion/with-connecticut-foundations-crumbling-your-home-is-now-worthless.html (describing house damaged by crumbling foundation as "gradually collapsing"); *see also Drown*, 314 Conn. at 162–63 ("[P]rovisions in insurance contracts must be construed as laymen would understand [them] . . . ."). Liberty Mutual's experts deny that the walls are collapsing and insist that the deterioration can be stopped. "[R]easonable minds c[an] . . . differ" with regard to the strength of the evidence, and, as such, the "competing opinions of the parties' experts" present a genuine issue of material fact "for the jury to decide." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *Jermiola*, 2017 WL 1258778, at *5.

Even were I to conclude that the Robertses' evidence of "substantial impairment" is rather weak—because, for example, their basement walls are bulging only slightly, the cracks do not appear wider than a millimeter at most, and the Robertses have not taken any action to repair or shore up the walls—several federal and state judges in Connecticut have permitted claims supported by similar evidence to go to a jury. *See, e.g.*, *Metsack*, 2017 WL 706599, at *1 ("The Metsacks' expert, David Grandpré, P.E., opined . . . that 'the severity of deterioration of the concrete basement walls compromised the[ir] structural integrity and will continue to weaken until they are no longer competent to perform their intended function of supporting the weight of

the floors, walls, and roof.'"); *Belz*, 204 F. Supp. 3d at 463 ("An evaluation of the basement

walls conducted by engineer David Grandpre . . . observes that the cracking damage resulted

from chemical processes that were 'hidden from view' and that the damage 'compromised the

structural integrity' of the Belzes' home."); *Roy*, 2017 Conn. Super. LEXIS 506, at *6 ("[T]he

plaintiff's expert witness, David Grandpré, . . . [opined] that the structural integrity of the

plaintiff's basement walls was 'substantially impaired,' . . . that the plaintiff's basement walls are

unreliable to perform their intended function . . . , and that the chemical reaction cannot be

stopped."). At the very least, those cases indicate that "reasonable minds c[an] . . . differ" with

regard to whether the Robertses have shown a "substantial impairment." *Bryant*, 923 F.2d at 982.

Because "reasonable persons, applying the proper legal standards, could differ in their responses

to the question  . . . on the basis of the evidence presented," I hold that summary judgment is

"inappropriate" with regard to whether the walls have "collapsed." *Sologub*, 202 F.3d at 178.

2. *Is there a "genuine dispute" with regard to whether the damage to the Robertses'
   basement walls is excluded as "[l]oss to . . . [a] foundation"?*

In addition to arguing that the basement walls have not "collapsed" at all, Liberty Mutual

contends that the policy "clearly bar[s]" the Robertses' claims because "the 'collapse' provision

excludes coverage for loss to a foundation or retaining wall unless the loss is a direct result of the

collapse of the building." Mem. Supp. Mot. Summ. J., Doc. No. 73, at 10 (citing Liberty Pol'y,

Doc. No. 74-1, at 11 ("Loss to . . . ] foundation, [or] retaining wall . . . is not included . . . unless

the loss is a direct result of the collapse of a building.")). Liberty Mutual asserts that the

basement walls are unambiguously "retaining wall[s]" or part of the "foundation," and so any

"loss" to those walls, "unless . . . a direct result of the collapse of the building," would not be

covered. *See id.* The Robertses respond that the term "foundation" is ambiguous and "could

mean the 'three-by-three foot piece of concrete under the basement wall' or 'footings' which support the entire structure." *See* Mem. Opp'n Mot. Summ. J., Doc. No. 78, at 12.

Judges of this court have "held several times in recent cases involving nearly identical facts and policy language that the terms 'foundation' and 'retaining wall' are ambiguous," and have construed those terms against the insurer under the interpretive doctrine of *contra proferentem*. *See Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 14-cv-01435, 2015 WL 5684063, at *3 (D. Conn. Sept. 28, 2015) (citing *Bacewicz*, 2010 WL 3023882, at *1–*4; *Karas*, 33 F. Supp. 3d at 115–16; *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 164 (D. Conn. 2014)). Liberty Mutual "respectfully disagrees with this [c]ourt's prior determinations," and, in particular, attacks the reasoning of Chief U.S. District Judge Janet C. Hall's *Bacewicz* opinion on which the other decisions partially rely. *See* Mem. Supp. Mot. Summ. J., Doc. No. 73, at 11–13 (distinguishing the facts in *Turner v. State Farm Fire & Casualty Cos.*, 614 So. 2d 1029 (Ala. 1993), which Chief Judge Hall discussed in *Bacewicz*). Liberty Mutual also cites a series of court decisions and dictionary definitions that support its position that basement walls are part of the "foundation." *See id.* at 14–15.

Even if Liberty Mutual's authorities support its preferred construction of "foundation," however, they do not demonstrate beyond peradventure that its construction is unambiguously correct. The Robertses, in response to Liberty Mutual's case citations and dictionary entries, offer citations and entries to support their own position that "'foundation' could mean the 'three-by-three foot piece of concrete under the basement wall' or 'footings' which support the entire structure." *See* Mem. Opp'n Mot. Summ. J., Doc. No. 78, at 12; *see also Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016, at *6 (D. Conn. Sept. 30, 2015) ("[T]he 'foundation' and 'footings' could refer to different elements of the below-ground masonry structure supporting the

house, necessitating that the Policy distinguish between the two terms."). "[L]anguage in a contract is ambiguous if it is susceptible to more than one reasonable interpretation." *Belz*, 46 F. Supp. 3d at 163 (citing *Poole v. City of Waterbury*, 266 Conn. 68, 88 (2003)). Here, all that Liberty Mutual has shown is that "both parties offer differing but reasonable interpretations," supported by judicial decisions and secondary authorities. *See id.* at 164. Because "[b]oth . . . interpretations of 'foundation' are reasonable . . . , it is an ambiguous term" that should be construed against the insurer. *See id.*

The same holds true for Liberty Mutual's efforts to demonstrate that the basement walls are unambiguously "retaining walls that prevent earth from entering the basement." Mem. Supp. Mot. Summ. J., Doc. No. 73, at 16 ("The purpose of a retaining wall is to hold back earth. Whether the wall is freestanding or attached to a structure, if it serves that function, it is a retaining wall."). The Robertses rejoin that "[a] 'retaining wall' is most commonly understood to be 'a wall for holding in place a mass of earth or the like, as at the edge of a terrace,'" and "is not usually thought of as part of a building." Mem. Opp'n Mot. Summ. J., Doc. No. 78, at 15 (http://dictionary.reference.com/browse/retaining+wall); *see also Metsack*, 2015 WL 5797016, at *8 ("Plaintiff's definition would conform with a more colloquial understanding of the phrase 'retaining wall' as typically referring to a free-standing structure . . . ."). Here, too, "[e]ach party . . . has a reasonable but different interpretation of the phrases supported by dictionaries and case law, so the phrases are ambiguous, and the insurance policy should be construed against Liberty Mutual." *See Karas*, 33 F. Supp. 3d at 115.

Furthermore, even if the aforecited cases erred in holding that "foundation" and "retaining wall" are ambiguous terms—as Liberty Mutual contends, Mem. Supp. Mot. Summ. J., Doc. No. 73, at 10—it is not apparent that the definition of those terms would be dispositive

here. Construing an identical exclusion, the Supreme Court of Rhode Island unanimously held that "any losses to the upper part of plaintiffs' home caused by the foundation's partial collapse are *not* among the . . . excluded losses." *See Campbell*, 682 A.2d at 935–36 (emphasis added). Thus, "to the extent that there were any cracked walls and unlevel floors in the upper part of the house owing to the foundation's collapse," the Rhode Island court held that "th[o]se losses would be covered." *Id.* at 936. In addition, because many if not most instances of "collapse" will originate in the foundation, to hold ensuing losses to be excluded would "render illusory . . . the earlier policy provision purporting to insure against the risk of 'collapse of a building or any part of a building.'" *Id.*; *see Harbour Pointe, LLC v. Harbour Landing Condo. Ass'n*, 300 Conn. 254, 261 (2011) ("[E]very provision must be given effect if it is possible to do so."). It also would conflict with the language of the policy in the present case, which states that for covered "collapses," "any *ensuing loss* to property . . . not excluded or excepted in this policy *is covered*." Liberty Pol'y, Doc. No. 74-1, at 12 (emphasis added).

Thus, regardless of whether the exclusion for "[l]oss to a[] . . . foundation" excludes damage to the foundation alone, "[n]owhere does the policy express a clear unambiguous intent to exclude coverage for a catastrophe that subsequently develops out of a loss that appeared, at its inception, to fall within the rubric of" loss to a foundation." *See Beach*, 205 Conn. at 252; *see also Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 402, 420 (D. Conn. 2002) (describing *Beach* as "interpret[ing] an analogous ensuing loss provision as 'contemplat[ing] coverage for a "collapse" that *follows consequentially* from excluded activity'") (quoting *Beach*, 205 Conn. at 251–52) (emphasis in *Yale Univ.*); *Bacewicz*, No. 3:08-cv-01530 (JCH), Trial Tr., Doc. No. 175, at 517–18 ("[T]he structure above . . . is at risk if the walls keep deteriorating to a point [that] they crumble or collapse."); *cf. Fabozzi v. Lexington Ins. Co.*, 639 F. App'x 758, 762 (2d Cir. 2016)

(summary order) ("Additional Coverage 8 is ambiguous. . . . [N]othing in the text makes clear whether we should prefer the reading, 'We insure for collapse only if it is caused by one of the following,' or 'We insure for collapse only if it is caused by one of the following, to the exclusion of all other causes.'"). Therefore, I conclude that the losses to the Robertses' basement walls are not excluded from coverage as a matter of law. Whether the Robertses have proved that their walls suffered a "substantial impairment of [] structural integrity" remains a matter for the jury to decide. *Metsack*, 2017 WL 706599, at *6 (citing *Beach*, 205 Conn. at 253).

B. <u>Count II: Breach of the implied covenant of good faith and fair dealing</u>

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Warner v. Konover*, 210 Conn. 150, 154 (1989). To prove a beach of the implied covenant of good faith and fair dealing, a plaintiff must show that the "defendant act[ed] in bad faith to impede the plaintiff's right to receive his or her reasonably expected benefits under the contract." *Belz*, 46 F. Supp. 3d at 164–65 (citing *De La Concha of Hartford v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004)). "[B]ecause the covenant of good faith and fair dealing only requires that neither party to a contract do anything that will injure the right of the other to receive the benefits of the agreement, it is not implicated by conduct that does not impair contractual rights." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 795 (2013) (internal quotation marks and alterations omitted). Thus, "evidence of a mere coverage dispute," without more, "will not demonstrate a breach of good faith and fair dealing." *Uberti v. Lincoln Nat'l Life Ins. Co.*, 144 F. Supp. 2d 90, 104 (D. Conn. 2001). "Whether a party has acted in bad faith is a question of fact . . . ." *Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.*, 281 Conn. 227, 240 (2007).

Liberty Mutual argues that "[t]he evidence and testimony reveals that this lawsuit concerns a mere coverage dispute," and that the Robertses "never presented a 'concrete decay' or 'collapse' claim to Liberty [Mutual]." Mem. Supp. Mot. Summ. J., Doc. No. 73, at 22; *see id.* at 22–23 ("Mr. Roberts reported that he had observed cracks in his walls and that his walls were 'disintegrating.' . . . There is no mention in the claim notes of [J.J.] Mottes concrete, a progressive collapse condition, [or] other 'concrete decay' claims . . . ."). The Robertses respond that "[t]hough Liberty Mutual professes ignorance of the condition affecting the Robertses' home, it has encountered the very same concrete damage in [several] prior instances." Mem. Opp'n Mot. Summ. J., Doc. No. 78, at 26. Indeed, in *Metsack*, Judge Bryant observed that "this is not the first 'concrete decay' claim in which Liberty Mutual or a related insurer within the Liberty Mutual Group has initially denied coverage on one basis . . . only to later raise arguments that the affected structures were excluded 'foundation[s]' or 'retaining wall[s].'" *Metsack*, 2015 WL 5797016, at *8–*9 (citing *Belz*, 46 F. Supp. 3d at 165).

The Robertses are correct that, in denying their claim, Liberty Mutual relied on interpretations of the terms "collapse" and "foundation" that have been repeatedly rejected by Connecticut state and federal trial courts. *See, e.g.*, *Metsack*, 2017 WL 706599; *Belz*, 204 F. Supp. 3d at 464; *Roy*, 2017 Conn. Super. LEXIS 506. Nevertheless, "[d]istrict court decisions . . . are not precedential," and "create no rule of law binding on other courts." *ATSI Commc'ns v. Shaar Fund*, 547 F.3d 109, 112 (2d Cir. 2008); *see also Threadgill v. Armstrong World Indus.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("The doctrine of *stare decisis* does not compel one district court judge to follow the decision of another."). Although Liberty Mutual's position has not prevailed so far, it is not "unreasonable on its face under existing insurance law," and until such time as those arguments are rejected by Connecticut's appellate courts or the Second Circuit,

Liberty Mutual is entitled to continue making them. *Cf. Hutchinson v. Farm Family Cas. Ins. Co.*, 273 Conn. 33, 45 (2005) (defendant cannot be held to "ha[ve] taken [a] position in bad faith" when "the position, although incorrect, was not an entirely unreasonable one").

"[I]t is not bad faith for an insurer to fight liability when policy coverage is unclear." *Am. Nat'l Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 271 (2d Cir. 1995). Here, despite my rejection of Liberty Mutual's coverage position, I conclude that the evidence in the record is not sufficient for a reasonable jury to conclude that Liberty Mutual denied the Robertses' claim in bad faith.[10] Therefore, I grant Liberty Mutual's motion for summary judgment with respect to Count II.

## C. Count III: CUTPA/CUIPA

To succeed on a claim under CUTPA/CUIPA, "a plaintiff must show that the defendant engaged in an act prohibited by CUIPA's substantive provisions, and that the act proximately caused the harm alleged." *Belz*, 46 F. Supp. 3d at 165 (citing Conn. Gen. Stat. § 38a-816(6)). A claim of "unfair settlement practice" requires that the plaintiff prove that "the defendant has committed the alleged proscribed act with sufficient frequency to indicate a general business practice." *Karas*, 33 F. Supp. 3d at 117. Examples of unfair settlement practices "include 'not

---

[10] A number of judges in this district have found allegations similar to those of the Robertses "sufficient to state a claim for breach of the covenant of good faith and fair dealing at the 12(b)(6) stage." *See Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016, at *9 (D. Conn. Sept. 30, 2015) (Bryant, J.) (citing *Belz v. Peerless Ins. Co.*, 46 F. Supp. 157, 164 (D. Conn. 2014) (Hall, J.); *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014)). But on a motion to dismiss for failure to state a claim, "the court is compelled to assume the truth of the plaintiff's factual allegations and draw all reasonable inferences in his [or her] favor." *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016). "The role of the court at th[at] stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Id.* On a motion for summary judgment, conversely, the opposing party "may not rest upon the mere allegations or denials of [the] pleading[s], but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In the present case, even after extensive discovery, the Robertses have not "set forth specific facts" that would permit a reasonable jury to conclude that Liberty Mutual acted in bad faith. *See id.*

attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear' 'with such frequency as to indicate a general business practice.'" *Id.* at 117 n.5 (quoting Conn. Gen. Stat. § 38a-816(6)(F)). As with breach of the implied covenant of good faith and fair dealing, a claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract. *See Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 378 (2008) ("Because we have concluded that the defendant's interpretation of the policy's coverage limitation was correct, there can be no genuine issue of material fact as to whether the application of that interpretation as a general business practice constituted oppressive, unethical or unscrupulous conduct in violation of the statutes.").

The Robertses have identified several other lawsuits against Liberty Mutual "alleging similar 'concrete decay' claims," *see Metsack*, 2015 WL 5797016, at *10, some of which have survived motions for summary judgment. *See, e.g.*, *Metsack v. Liberty Mut. Fire Ins. Co.*, 2017 WL 706599, at *5–*6 (D. Conn. Feb. 21, 2017); *Belz*, 204 F. Supp. 3d at 464. A district court's denial of summary judgment does not make "liability . . . reasonably clear," however. *Cf.* Conn. Gen. Stat. § 38a-816(6)(F). Not only is such a ruling "not precedential" and not binding on any other court, *see ATSI Commc'ns*, 547 F.3d at 112, but also it does not hold that the defendant actually *is* liable—it merely "determin[es] that a reasonable factfinder *could* find [defendant] liable on the claims against it." *Cf. Koch Indus. v. Hoechst Aktiengesellschaft*, 727 F. Supp. 2d 199, 224 (S.D.N.Y. 2010) (emphasis added). Unless and until a higher court rejects Liberty Mutual's position, the insurer is entitled to continue making its (hitherto unsuccessful) arguments with respect to coverage, without exposing itself to liability under CUTPA/CUIPA. *Cf. Kenealy*, 72 F.3d at 271; *Hutchinson*, 273 Conn. at 45.

Here, I conclude that the existence of other nonbinding decisions that deemed Liberty Mutual potentially liable would not make it "reasonably clear" that Liberty Mutual actually was liable, and so could not persuade a reasonable jury to find that Liberty Mutual violated CUTPA/CUIPA.[11] *See* Conn. Gen. Stat. § 38a-816(6)(F). Because the Robertses have not introduced any other evidence to support their CUTPA/CUIPA claim, I grant Liberty Mutual's motion for summary judgment with respect to Count III.

## IV.    Conclusion

The Robertses have introduced evidence sufficient to persuade a reasonable jury that their basement walls have suffered a "collapse" in the form of a "substantial impairment of [] structural integrity." They have not, however, introduced evidence sufficient to persuade a reasonable jury that Liberty Mutual breached the implied covenant of good faith and fair dealing or violated CUTPA/CUIPA. Therefore, I deny Liberty Mutual's motion for summary judgment with respect to Count I, and grant it with respect to Counts II and III.


So ordered.

Dated at Bridgeport, Connecticut, this 28th day of August 2017.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

---

[11] Again, the existence of those decisions might be sufficient to survive a motion to dismiss, because on such a motion the court "accept[s] as true all factual allegations contained in the complaint and draw[s] all inferences in the plaintiff's favor." *Vasquez v. Empress Ambulance Serv.*, 835 F.3d 267, 271 (2d Cir. 2016). An entirely different situation is presented by a motion for summary judgment, where the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.